MELVIN D. KROHMER, Administrator of the ESTATE OF MELVIN D. KROHMER, Deceased, Plaintiff and Respondent, v. EMIL H. DAHL, ELDON H. DAHL and the Dahl Funeral Home of Bozeman, Montana, Defendants and Appellants.

No. 10880

Submitted April 13, 1965. Decided May 20, 1965.

402 P.2d 979

Lyman H. Bennett, Jr. (argued), Bozeman, Weymouth D. Symmes (argued), Billings, for appellants.

John M. Kline (argued), Glasgow, Jerome B. Wallander, Froid, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This appeal arises as the result of a jury verdict in the sum of $85,000.00, being awarded to the respondent in the District Court of the Eighteenth Judicial District. Of the total verdict, $50,000.00 was awarded on the basis of a survivorship action and the remaining $35,000.00 given as the result of a wrongful death claim.

The appellants, defendants below, are the Dahl Funeral Home of Bozeman, Montana, a partnership, and Emil H. Dahl and Eldon H. Dahl, the owners thereof. The respondent, plaintiff below, is Melvin D. Krohmer, administrator of the estate of his son, Melvyn D. Krohmer, deceased.

The decedent, Melvyn Krohmer, was eighteen years of age and enrolled as a freshman at Montana State College in Bozeman at the time of his death. He resided in a room in the Dahl Funeral Home which was furnished to him in exchange for odd jobs that might be required of him from time to time by Emil Dahl. The decedent's room adjoined the garage of the funeral home wherein the defendants parked various vehicles including a certain 1960 Cadillac automobile, title to which was in the name of the Dahl Funeral Home of Bozeman, Montana. There was a window between the room occupied by Melvyn Krohmer and the garage. This was the only window located in the decedent's room and it was usually open.

On May 2, 1963, Emil H. Dahl at approximately 1:15 a. m.

drove the Dahl Funeral Home Cadillac into the garage and parked it close to where the window was located in the room occupied by Melvyn Krohmer. He then locked the garage and went to bed. On the same day at approximately 7:45 a. m., Emil Dahl was awakened by his wife who told him that she smelled gas. He thereupon went to the garage in which the Cadillac was stored and found the motor running and the garage full of carbon monoxide gas. Emil Dahl then went to the room occupied by the decedent. He found Melvyn Krohmer dead in his bed. It was determined that Krohmer died of carbon monoxide poisoning.

Emil Dahl testified that in December of 1962 he had experienced difficulties with his 1960 Cadillac automobile in that when the switch was turned off the motor did not stop. He then had the car repaired and a new switch installed. He also testified that in February of 1963 he had further trouble with the switch, experiencing the same problem, and that he had Roscoe Hull of Auto Electric Station of Bozeman repair it. Again a few days later he was unable to turn the motor off and had to stop it by removing a battery cable. After this third failure of the switch there was no repair work performed on either the starter or the switch prior to Melvyn Krohmer's death. Emil Dahl further testified that when he found the motor of the Cadillac running on the morning of May 2, 1963, he shut it off by turning the key back and forth. Roscoe Hull, who examined the car after the death of Krohmer, testified that he found nothing wrong with the switch, and that the car could not start by itself.

The appellants specify as error that the lower court erred in admitting the testimony of Dr. George Heliker; that the lower court was in error in giving certain instructions and in not giving certain other instructions; and that the verdict was excessive.

We first direct our attention to the admissibility of the testimony and exhibits of Dr. Heliker who is a professor of eco-

nomics at the University of Montana and testified as an expert on behalf of the plaintiff. He was examined in regard to a series of charts he prepared. He testified to the possible earnings of classes of people of the same type as the decedent if they had survived through their normal life expectancy. Both the testimony and exhibits of Dr. Heliker were allowed over the objection that they were speculative.

The information relied upon by Heliker was obtained chiefly from the United States Bureau of Census involving the 1960 census of population, and detailed characterizations in Montana for the year 1959. This information gathered by the Census Bureau was obtained by a 25 per cent random sample of the population of Montana. It shows the average income of the people of Montana at various ages and various degrees of intelligence. According to Heliker this Census Bureau data is used by economic researchers, insurance companies, financial agencies, and banks as the basis for statistical information.

This court agrees that the testimony and exhibits of Heliker were speculative in nature, but no more so than any other evidence that has for its purpose the proof of future action or events. The issue before the trial judge, as seen by this tribunal, was whether the testimony of Heliker should be allowed, in order to give the jury some basis upon which to reach a conclusion in regard to the possible future earnings of the decedent, or whether to leave the jury unguided and hope that by their common knowledge and sense of justice they might arrive at a more accurate estimation of damages. It appears to us that in this particular case the element of conjecture is reduced significantly by the admission of expert testimony as to the possible future earnings of the decedent. It also appears that this expert testimony is not only the best evidence, but the only evidence available in this case to prove future earnings.

Further, it is undisputed that the determination of the admissibility of expert testimony is within the discretion

of the trial court. (Nesbitt v. City of Butte, 118 Mont. 84, 163 P.2d 251.) In an effort to show an abuse of discretion by the trial court counsel for the appellants cited Barnes v. Smith, 10 Cir., 305 F.2d 226 (1962). The Barnes case held that the trial court in refusing to admit testimony of the type given by Dr. Heliker in this case did not abuse its discretion. However, even if the Barnes case is intended to declare inadmissible the testimony of a statistician-economist as to future earnings in all cases, the hands of this court have not been tied by that decision. We feel that the testimony of Dr. Heliker was properly admitted and as stated in Merrill v. United Airlines, Inc., D.C. 177 F.Supp. 704 (1959), that specialists will be called upon more frequently to give expert testimony as knowledge becomes more professionalized. In this case the testimony of a specialist presented the jury a reasonable basis upon which to estimate with some degree of certainty the probable future earnings of the deceased. Thus, the decision of the trial judge in admitting Heliker's testimony did not result in a verdict based on a greater degree of conjecture, nor can it be said that by this decision he abused his discretion.

There are numerous cases that have held admissible evidence of prospective earnings of a student or trainee, e. g., see Hall v. George, 403 Pa. 563, 170 A.2d 367; Turietta v. Wyche, 54 N.M. 5, 212 P.2d 1041, 15 A.L.R.2d 407; Consolidated Kansas City Smelting & Ref. Co. v. Taylor, 48 Tex.Civ.App. 605, 107 S.W. 889. The appellants contend that such evidence is not admissible unless the course under study relates to a given occupation or profession and it is shown that the student is reasonably certain to follow that occupation or profession. It is true that the majority of these decisions deal with students who are studying for a specific occupation or profession, however, not one of these cases indicate that evidence of one's education as a guide to future earnings is not admissible where the student is engaged in general studies or whose education does not relate to a specific occupation. In the Consolidated

Kansas City Smelting and Ref. Co. case, supra, the plaintiff was allowed to show that he had recently graduated from high school and that he was now studying at night. The course of study the plaintiff was pursuing or the vocation he intended to follow were not mentioned in the opinion of the court.

An excellent statement in regard to proof of future earnings appears in Turrietta v. Wyche, 54 N.M. at p. 15, 212 P.2d at p. 1047, supra. It is as follows:

█ "No general rule can be formulated that would properly control the admission of evidence to prove a man's future earning capacity. It must be arrived at largely from probabilities; and any evidence that would fairly indicate his present earning capacity, and the probability of its increase or decrease in the future ought to be admitted."

The testimony of Dr. Heliker indicated what the future earning capacity of Melvyn Krohmer might be and we affirm its admission into evidence.

The remaining major issue in this case arises from appellant's specification as error the giving of instructions number 11 and 14. Instruction number 11 reads as follows:

"You are instructed that direct evidence as to how the 1960 Cadillac automobile of the defendants happened to be running the morning of May 2, 1963, is not necessary in order to establish the liability of the defendant, Emil H. Dahl, for the injuries to and subsequent death of Melvyn Douglas Krohmer caused by carbon monoxide poisoning."

Instruction number 14 reads as follows:

"The *res ipsa loquitur* doctrine simply stated is this: That when an instrument which caused the injury without any fault of the injured party is under the exclusive control of the defendant or the defendant has the right of control at the time of injury and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, then the law presumes negligence on the part of

the one in control as the cause of the injury; this presumption is a disputable one."

The basic objection of the appellants to the above companion instructions is that the doctrine of *res ipsa loquitur* does not apply where the defendant has only the right of control over the instrument causing the injury.

This court has defined res ipsa in Whitney v. Northwest Greyhound Lines, 125 Mont. 528, 533, 242 P.2d 257, to be as follows:

"*The res ipsa loquitur* doctrine simply stated is this: That when an instrumentality which causes injury, without any fault of the injured person, is under the exclusive control of the defendant at the time of the injury, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, then the law infers negligence on the part of the one in control as the cause of the injury."

The significant difference between this definition and Instruction No. 14 is the inclusion in the instruction of the phrase, "or the defendant has the right of control." It is error to instruct a jury that the doctrine of *res ipsa loquitur* applies, without exception, where the defendant has only the mere right of control. (See Jackson v. William Dingwall Co., 145 Mont. 127, 399 P.2d 236.) However, here it was harmless error. Under the facts of this case the defendant exercised sufficient control over the automobile to justify the application of the doctrine of *res ipsa*.

Our definition of *res ipsa loquitur* in the Whitney case, supra, is not accurate if literally interpreted. It is in need of further explanation and we wish to take this opportunity to clarify it. The requirement of "exclusive control * * * at the time of the injury" does not mean actual physical control. A brief glance at some of the situations where *res ipsa* has been applied show this to be true. The case of a bottle exploding or the starting up of a parked automobile are examples where the

doctrine of *res ipsa loquitur* has been applied even though the mishap occurs at a time and place remote from the defendant's actual physical control. (Zentz v. Coca Cola Bottling Co., 39 Cal.2d 436, 247 P. 2d 344; Lewis v. Wolk, 312 Ky. 536, 228 S.W.2d 432, 16 A.L.R.2d 974). Thus, the requirement of control as applied does not mean actual physical control at the time of injury. It may be sufficient to show that the defendant exercised control some time prior to the injury.

Prosser has suggested that this requirement be disposed of in *res ipsa* cases. He states:

"* * * It would be far better, and much confusion would be avoided, if the idea of 'control' were discarded altogether, and we were to say merely that the apparent cause of the accident must be such that the defendant would be responsible for any negligence connected with it." (Prosser, Law of Torts, 3rd Ed., p. 225).

This does not mean that the possibility of other causes be eliminated altogether, but only that it be shown that the greater probability lies at defendant's door. (Harper & James, The Law of Torts, § 19.7, p. 1086).

In the case before us Emil Dahl was the last known human agency to exercise control over the Cadillac. He knew that the switch had failed on three previous occasions and had not been repaired after the third failure. When he locked the Cadillac in the garage near the window in the room occupied by Melvyn Krohmer it became his duty to insure that the motor was not left running. Although the remote possibility exists that Krohmer may have started the Cadillac himself, the fact that Emil Dahl had to turn the key back and forth in order to shut off the motor that morning gives rise to a greater probability that the cause of Krohmer's death was that the switch had failed for the fourth time.

When an instrumentality is found left in a dangerous condition the natural inference is that it was left in that condition by those who normally operate and control it. The

plaintiff is not required to negate all possibility of intervention on the part of others. Such a requirement would make it necessary for him to prove his case by what would be almost a mathematical certainty. (McCall v. United States, D.C., 206 F.Supp. 421 (1962).) Where there are other equally probable causes of the injury there must be some evidence which will permit the jury to eliminate them. (Prosser, Law of Torts, 3rd Ed., p. 223.) Again, the evidence in this case shows the failure of the switch to be the most probable cause of the death of Melvyn Krohmer.

The appellants also contend the court below was in error in giving and in refusing to give certain other instructions. An examination of the transcript reveals that the instructions given were both proper and adequate and we feel further comment in regard to these instructions is unnecessary.

Finally, the appellants claim that the verdict was excessive. This final contention is apparently based upon the belief that the verdict stems directly from the testimony of Dr. Heliker. We have already determined that the testimony of Heliker was properly admitted into evidence. Certainly, a verdict based on admissible evidence is not subject to a claim of excessiveness.

The issues raised by this appeal having been decided in favor of the respondent the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, DOYLE and ADAIR concur.