ROWLAND M. MORRIS, Plaintiff and Respondent, *v*. COR-
CORAN PULPWOOD COMPANY, Inc., a Montana Cor-
poration, Defendant and Appellant.

No. 11626.
Submitted January 21, 1970.
Decided February 24, 1970.
Rehearing Denied March 5, 1970.
465 P.2d 827.

Landoe, Gary & Olson, Hjalmar B. Landoe (argued), Boze-
man, for defendant-appellant.

Knight, Dahood & Mackay, Condc F. Mackay (argued), Anaconda, for plaintiff-respondent.

MR. JUSTICE CASTLES, delivered the Opinion of the Court.

This is an appeal from a judgment entered on a jury verdict after a motion for new trial was denied.

The controversy involves a dispute as to the amount to which the plaintiff was entitled under a logging contract. In May 1966, Plaintiff Rowland M. Morris entered into an oral contract with defendant, Corcoran Pulpwood Company, Inc., a Montana corporation (hereinafter referred to as Corcoran), to harvest a stand of lodgepole pine timber which had been purchased by Northern Timber Company of Deer Lodge from the Mount Haggin ranch. The timber stand produced two types of merchantable timber, saw logs and pulpwood.

A tree that would produce one or more sixteen foot logs (trimming allowance will not be mentioned), with a small end diameter of generally six inches, was utilized as a "saw log;" with the remainder, if any, utilized in 100 inch "sticks" for pulpwood. A tree that was of a lesser size, but generally above two sticks tall with a minimum 4 inch top, was utilized for pulpwood; and certain smaller trees for car stakes.

The saw logs were delivered to the Northern Timber Company sawmill and were scaled at the mill. Payment to Morris in the year 1966 was on the basis of $17 per thousand board feet for cutting, trimming, skidding and decking. The mill scale at the mill was the basis for measurement. The Northern Timber Company was receiving its own saw logs, logged by Corcoran through Morris as a subcontractor.

The pulpwood was shipped by Corcoran to paper mills in Wisconsin by rail in 100 inch sticks. Each car contained varying amounts by volume and were not scaled until they reached the mills at their destination. Short cars and long cars were

used, but everyone involved used an estimate of 25 cords per car as a preliminary estimate.

Payment for the pulpwood for cutting, trimming, skidding, and decking was on a basis of $6.25 per cord. But, as will appear, the controversy arose over how much pulpwood was logged by Morris. According to Morris he was to receive $6.25 per cord measured in the woods; although he admitted that no one measured it. (More will be said later concerning Morris' version). Corcoran's version was that the measurement was to be based upon mill scale at destination.

Morris went to work on the Mount Haggin property in June 1966. He hired men on a piecework basis for felling, trimming, skidding and decking. Before any timber was produced by Morris, Corcoran advanced $2500. Thereafter, on the 5th and 20th of each month Corcoran would pay an advance to Morris based on Morris' report of material produced. Morris operated on the Mount Haggin property until the end of 1966. At this time he still had wood in decks which had not been hauled by Corcoran. Corcoran was to do the hauling. In 1967 some of this wood was hauled out and the parties agreed it was to be computed on the 1966 terms. During 1966 Corcoran advanced to Morris the sum of $97,118.66.

Also during 1966, in addition to the pulpwood and saw log agreement, there were other oral agreements between the parties. Morris, through Corcoran's Superintendent Delin, purchased a "slasher", a machine used to "buck" the trees into saw logs and/or cordwood sticks. Morris could not finance the purchase on his own so Corcoran arranged for the purchase by Morris and deducted 50 cents per cord towards the purchase price. Morris was to do the slashing at $4.25 per cord. Morris did some slashing of his own production and of the production of two others. After some abortive attempts, Morris gave up on the slasher. Although he claimed and testified during the trial that he had an equity in the slasher, he admitted when confronted with checks showing payment that

he had been repaid by Corcoran for all of his investment and withdrew his claim. Also there were agreements for cutting and providing car stakes for railroad cars, use of a "cat" on road work and surveys claimed by Morris. He first testified that they had not been paid. However, when confronted with cancelled checks showing payment, he admitted the claims had been paid and they were withdrawn.

At the end of 1966, Morris had felled an undetermined amount of timber, but had not skidded and decked it. No accounting was had between the parties. Corcoran's position was that it had advanced more money than Morris had produced, since the wood remaining on the ground was not available yet.

At any rate, another oral agreement was made between Morris and Corcoran for the year 1967. The trees that had been felled but not skidded and decked in 1966 were to be skidded and decked at the 1966 price. The new work was on a different basis, Morris to fell and deliver to Deer Lodge pulpwood at $15.25 per cord and saw logs at $28.50 per thousand. Some of the 1966 wood was processed, but much of it remained on the ground.

In 1967, when this controversy arose, Corcoran had advanced or paid $141,331.59 to Morris, $44,212.93 of which was paid in 1967.

At pretrial it was agreed that the issues were:

(1) What has plaintiff earned for services performed for defendant?

(2) What is the present status of the accounts between the parties?

These issues revolved around two things in the main. How much wood did Morris produce and how was it to be measured? Many ancillary and really diversionary matters were gone into at the trial, such as the previously mentioned items Morris claimed were not paid for but then admitted had been in fact paid for. Counsel withdrew these items. Also much

testimony concerning waste, poor logging practices and other things were examined and looked into. Corcoran hired a professional forester shortly before the trial to go into the woods and estimate, based upon some measurements and sampling, the wood remaining. This figure combined with the mill scales of both pulpwood and saw timber are the figures relied upon by Corcoran.

On the other hand, Morris testified he cut a certain number of trees; he then used a formula to compute the number of cords. Morris testified from his scanty records which amounted to a ledger book with tallies of "log counts" for each man, felling or skidding. It was Morris' contention that he was not to be paid according to mill scale; this, even though no other scale was used, made, or contemplated. He insisted that "log count" shown in his ledger was synonymous with "number of trees." Herein lay the whole problem.

As to the word "count", all of the witnesses agreed that in the logging business the term is a word of art; that is, it has a significance as a system of compensating a faller for falling large trees. The usual system of compensating fallers in pulpwood areas such as the lodgepole timber here was that one count represented a tree under 12 inches, double that, or two counts for trees 12 to 16 inches; and triple, or three counts for trees over 16 inches. A faller would receive 18 cents per tree if it was 12 inches or under, 36 cents per tree from 12 to 16 inches, and 54 cents for trees over 16 inches. Of this latter class, all witnesses agreed there were not too many. But, the fallers were paid normally thus in the industry and the defendant's witnesses so testified in this instance, even though the particular tree cut might be measured eventually as "cords", a volume measure; or "board feet", a linear or diagram measure.

Morris' tabulation of "log counts" totalled 135,127. Morris testified that the "log counts" were "number of trees". Thus, by use of a formula converting six trees to one cord, he

arrived at a cordage figure. The arithmetic used is not of importance, but the significance of "tree numbers" vs. "log counts" is of utmost importance since it is the "variable" factor in the formula. In this discussion we are accepting Morris' method of estimating the cordage, rather than referring to Corcoran's mill scales and expert sampling data, simply to point up the issue on this appeal.

We have heretofore noted the normal method of payment on piecework for falling. However, on another piecework basis, that of skidding and decking, Morris' ledger book also reflects the tally in "log counts" whereas the trees were skidded and decked in tree lengths. Thus, the record is not clear on the meaning of the ledger entries.

Corcoran has appealed from the judgment and puts forth three issues. The first issue as to whether there was sufficient evidence to sustain a jury verdict in favor of Morris we find need not be discussed in view of our holding on the second and third issues.

The second and third issues are whether the court erred in not granting a new trial on grounds (a) because of false testimony by Morris, Corcoran was surprised and unable to meet the testimony, and (b) whether newly discovered evidence to prove the falsity of Morris' testimony should have been considered. These separately stated issues are interwoven.

As indicated heretofore, discovery proceedings had produced Morris' ledger book records. The tallies were in "log counts". Yet Morris testified at the trial that the tallies did not mean "log counts" but rather meant "number of trees". This is what appellant Corcoran claims as surprise. In connection with the ledger book tallies, Morris in his deposition had stated that he made up the ledger record from reports of his woods boss, one McCroskey. When asked the whereabouts of McCroskey, the fallers, and other workers, Morris claimed not to know. During the trial, after Morris had testified, the defendant Corcoran was able to find one man, Herb Watts. Watts testi-

fied flatly in contradiction to Morris as to how he was paid, that is by "counts" rather than "number of trees". Counsel for Morris, on cross-examination, was able to show ill-feeling on Watts' part towards Morris and quite effectively weakened his testimony.

After the trial Corcoran was able to find all of the men who had worked for Morris, including McCroskey who had supplied the information that Morris furnished. In each case, including McCroskey, the men flatly contradicted Morris by affidavit. Several of these affidavits were furnished the trial court. Thus, if these affidavits reflect the truth, Morris' testimony upon which his entire estimate of cordwood volume depended, and upon which the jury verdict depended, was false.

Morris stood alone on his testimony. He did not produce other witnesses. He claimed to rely on his sketchy records, but as we have shown before gave a different interpretation of "log count" than anyone familiar with the business would reasonably anticipate. Respondent Morris' brief flatly states there could have been no surprise since the testimony of Morris, Corcoran and Delin, Corcoran's supervisor, dealt in "log counts" and "tree counts". However, "tree counts" and "number of trees" are not synonymous in the industry and a reasonable man would not have anticipated the Morris statements.

Counsel for Morris also asserts that Corcoran did not ask for a continuance of the trial. However, in cross-examining Morris, counsel had tried to find from Morris the whereabouts of the men who had worked for him. It is true that Corcoran had payrolled some of the same men in 1967, but they were under Morris' supervision. Under these circumstances Corcoran's counsel may not have known whether a continuance of the trial would help his situation.

In Campeau v. Lewis, 144 Mont. 543, 398 P.2d 960, discussing a denial of a motion for new trial this Court said:

"Several of the cases cited by the respondent deal with a

denial of a motion for a new trial and then an appeal to this court. In such cases the court has been somewhat reluctant to set aside an act of discretion of the trial judge. In the Tripp case [Tripp v. Silver Dyke Mining Co., 70 Mont. 120, 224 P. 272], for example, this court refused to disturb the trial judge's decision to deny the motion for a new trial. However, in the instant case the trial judge did grant a new trial, thereby choosing not to follow the finding of the jury. When the trial court denies a motion for a new trial and thereby indicates faith in the jury verdict we are more apt to refrain from disturbing that order than where the trial judge sets aside the jury's findings and requires that the facts be decided again. Where the trial judge is presented with evidence in favor of the verdict, but proceeds to grant a new trial, we feel it is our duty to test the evidence against the verdict. We respect the discretion of the trial judge, but are of the opinion that in this case he was unreasonable in granting the new trial. Of course, the advantageous position of the jury to resolve the facts does not remain when they return an 'incredible' verdict. Casey v. Northern Pacific Ry. Co., 60 Mont. 56, 198 P. 141; Cf. Adami v. Murphy, 118 Mont. 172, 164 P.2d 150, where the verdict for the defendant was an incredible one. However, in the instant case there is nothing incredible about the verdict for the defendant."

Here we have the situation where we are more apt to refrain from disturbing the order; but, where the result would be a miscarriage of justice because the verdict was based upon false testimony, we will not refrain from disturbing the order, because this is an abuse of discretion on the trial court's part.

Section 93-5603, R.C.M.1947, sets forth the grounds upon which a new trial may be granted. In Hill v. McKay, 36 Mont. 440, 446, 93 P. 345, one of the grounds asserted was that the moving party was surprised by testimony offered at trial. There this Court set down the following criteria:

"* * * it is the general rule that a new trial will be

granted on the ground of surprise, only when it is clearly shown that the movant was actually surprised, that the facts from which the surprise resulted had a material bearing on the case, that the verdict or decision resulted mainly from these facts, that the alleged condition is not the result of movant's own inattention or negligence, that he has acted promptly and claimed relief at the earliest opportunity, that he has used every means reasonably available at the time of the surprise to remedy the disaster, and that the result of a new trial will probably be different."

In Whitfield v. Debrincat, 18 Cal.App.2d 730, 64 P.2d 960, the court held that where a witness testifies falsely, after counsel had made reasonable attempts to guard against it and relies on these attempts, and the case is lost, a new trial should be granted.

The Whitfield case required that counsel try to avert disaster by requesting a continuance *or* by the introduction of other testimony. This is the very course that counsel for Corcoran pursued. They reasonably assured themselves at Morris' deposition that he was talking in terms of "counts". This was confirmed by examination of his "counts" ledger. When it appeared Morris was testifying falsely about his production, counsel immediately launched a search for other cutters. Gerald Delin was placed on the stand to establish that Morris used the "count" system. This failed. Herb Watts, a cutter, was placed on the stand. He was ferociously attacked by opposing counsel and the jury apparently believed Watts was lying. That he was telling the truth, as stated earlier was confirmed when *every* cutter including the woods boss, found after the trial, stated the "count" system was used. It is interesting to point out that opposing counsel were able to produce no one who would confirm Morris' testimony.

Counsel did everything reasonably possible to counter the effects of Morris' faulty testimony under the circumstances.

A new trial would bring about a confrontation between

Morris and his former employees. The jury would thus have an opportunity to judge who was mistaken and who was telling the truth.

We have pointed out heretofore the shifting sands of the plaintiff's evidence. We have pointed out, too, the most material and significant difference in "log counts" and "number of trees" resulting in any formula applied. As was said in Hill v. McKay:

"A consideration, which is conclusive, however, is that it is not at all apparent that there is any probability that the result reached by the trial judge would be different if a new trial were granted. As stated above, the evidence is not before us * * *" 36 Mont. 440, 448, 93 P. 345.

In the instant case the opposite is true. The evidence is before us and the probability of a different result is mathematically certain, if indeed the falsity of Morris' testimony is proven. Thus, under these circumstances, a new trial should be had. It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN C. HARRISON and BONNER, concur.

MR. JUSTICE HASWELL, (dissenting).

I dissent.

The result reached by the majority is bottomed on their conclusion that plaintiff's testimony at the trial concerning his production and his method of measuring it is false. This conclusion is directly contrary to that expressed by the jury in their verdict and the trial judge in his order denying a new trial.

The majority reach this contrary conclusion on the basis of three affidavits of former employees of plaintiff. Defendant secured these affidavits several days after the conclusion of the trial and the adverse jury verdict. These affidavits indicate that these employees were paid on a "count" basis and

that such "count" was reported to plaintiff's foreman rather than to plaintiff himself. This information, if believed, tends to rebut plaintiff's testimony at the trial and his ledger record introduced in evidence indicating "number of trees" or "tree count" as a basis rather than "count" or "log count". To import superior probative value and credibility to statements contained in ex parte affidavits secured by a litigant following an adverse jury verdict over testimony given at the trial by a witness subjected to cross-examination is wholly unwarranted in my view.

Additionally, the majority opinion constitutes a clear departure from controlling legal precedent governing new trials. Here the majority has awarded defendant a new trial on the basis of surprise, which ordinary prudence could not have guarded against (section 93-5603(3), R.C.M.1947) coupled with newly discovered evidence which defendant, in the exercise of reasonable diligence, could not have discovered and produced at the trial (section 93-5603(4), R.C.M.1947). In my view there was no surprise here, the newly discovered evidence was merely cumulative and thus insufficient to authorize a new trial, and in any event defendant is foreclosed by his failure to request a continuance.

The record discloses that defendant was not surprised but on the contrary knew plaintiff's position long before the trial. The deposition of Gerald H. Delin, defendant's superintendent, which was taken more than 4 months prior to trial, indicates that he was aware that the basis of plaintiff's records and computations was not "log count" but "tree count." Two examples will suffice:

"Q. Now, these advances that you paid to Mr. Morris, these were advances based on his log count— A. Tree count—

"Q. His tree count to you, is that correct? A. Yes, sir.

"Q. They were based on that? A. Yes."
and again:

"Q. And they base their figures on actual log count, is that right? A. Actual tree count.

"Q. Tree count, I mean— A. Yes."

Additionally plaintiff's deposition was taken prior to trial, a pretrial conference was held, and it was patently evident that the parties had used different methods of measurement of plaintiff's production. How could defendant be surprised by plaintiff's testimony at the trial concerning measurement of his production under these circumstances?

The so-called newly discovered evidence of defendant was merely cumulative in character in any event. The testimony of Herbert Watts, a former employee of plaintiff called as a witness for defendant at the trial, was to the effect that plaintiff's fallers were paid according to "counts". Gerald H. Delin, defendant's superintendent, testified to like effect. This is the same testimony that is contained in the affidavits of the three former employees of plaintiff on which basis a new trial is sought. The trial court made a specific finding to this effect in its order denying a new trial:

"This court holds, however, that the 'new' testimony of the Defendant, not produced, is not new testimony, but would be merely an accumulation of the testimony produced at the trial * * *".

Testimony that is merely cumulative in character has uniformly been held insufficient to authorize a new trial. Apostel Const. & Lumber Co. v. Radulovich, 115 Mont. 43, 139 P.2d 234; Ebaugh v. Burns, 65 Mont. 15, 210 P. 892; Jenkins v. Kitsen, 62 Mont. 515, 205 P. 243.

But perhaps the most compelling reason why a new trial is not authorized here is that defendant did not act promptly and claim the relief he now seeks at the earliest opportunity. Instead of moving for a continuance at the time the alleged surprise took place to secure rebutting evidence, defendant chose to proceed with the evidence he had and submit his case to the jury. Now after an adverse jury verdict, he seeks

a new trial to relitigate the very issue he chose to submit to the jury in the first instance under the existing posture of the case.

In Hill v. McKay, 36 Mont. 440, 93 P. 345, this Court set up various requirements that must be met before a party is entitled to a new trial on the ground of surprise, two of which are: (1) that the party seeking a new trial has acted promptly and claimed relief at the earliest opportunity, and (2) that he has used every means reasonably available at the time of the surprise to remedy the situation. Neither requirement is met in the instant case.

The majority opinion justifies a new trial on the basis that defendant did what he could to avert disaster by introducing other testimony, citing the California case of Whitfield v. Debrincat, 18 Cal.App.2d 730, 64 P.2d 960, in support. This line of reasoning presupposes that plaintiff has testified falsely and that defendant's counsel has made reasonable attempts to guard against it and relies on these attempts. This is not the situation in the instant case. Here the jury chose to believe plaintiff and rejected the premise that he was testifying falsely. Under such circumstances it is hardly the function of this Court to weigh the credibility of plaintiff as a witness and arrive at an opposite conclusion from that of the jury.

For the foregoing reasons, I consider it a miscarriage of justice to grant defendant a second trial to relitigate the very issues that the jury foreclosed against it at the first trial.