No. 12060

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

RICHARD SANDERS and ANNASTELLE SANDERS,

Plaintiffs and Respondents,

-vs-

MOUNT HAGGIN LIVESTOCK COMPANY,
a Montana corporation,

Defendant and Appellant.

---

Appeal from: District Court of the Third Judicial District,
Honorable Nat Allen, Judge presiding.

Counsel of Record:

For Appellant:

Poore, McKenzie & Roth, Butte, Montana.
Urban L. Roth argued, Butte, Montana.
Donald C. Robinson argued, Butte, Montana.

For Respondents:

Knight, Dahood and Mackay, Anaconda, Montana.
Wade J. Dahood argued, Anaconda, Montana.
David M. McLean argued, Anaconda, Montana.
McKeon & McKeon, Anaconda, Montana.
John L. McKeon argued, Anaconda, Montana.

---

Submitted: June 13, 1972

Decided: AUG 2 1 1972

Filed: AUG 2 1 1972

Thomas J. Kearney
_____
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of the third judicial district, Deer Lodge County. The jury returned a verdict in favor of plaintiffs and awarded damages in the sum of $96,140. Defendant moved the trial court for a new trial and for judgment notwithstanding the verdict; both motions were denied by the trial court. Defendant appeals from the judgment.

In early May 1969, defendant Mount Haggin Livestock Company owned approximately 600-850 head of Black Angus cattle which were pastured in a fenced pasture in the Deer Lodge Valley between Galen and Anaconda, Montana, in the general proximity of Montana Highway No. 273. This highway is also known as the Lost Creek Highway or the Old Galen Road. The enclosure in which the cattle were pastured was referred to throughout the trial as the "Peterson Place".

On the three days of May 8 to May 10, 1969, Mount Haggin divided the cattle into two groups, with no attempt being made to keep the cows with their respective calves, and then moved each group from the Peterson Place down the Lost Creek Highway, approximately one-half to three-quarters of a mile, to a pasture known as the "Swamp Pasture" or the "Poor Farm Pasture".

Three cowboys, James Baustadt, Jim Nolan and Donald Martz, who had worked for defendant during the herding operation but were employed elsewhere at the time of trial, testified as to the facts of that herding. They established the operation had taken three days. The first two days, May 8 and 9, each of the two halves of the herd were driven to the Poor Farm Pasture. On Friday, May 9, a "spill back" occurred, i.e., some of the cattle turned around at the entrance to the Poor Farm Pasture to which they were being moved, and they ran back up the road to the Peterson Place where

- 2 -

they had been originally pastured. On Saturday, May 10, the cowboys returned to the area and picked up the strays which had either been left in the Peterson Place pasture or had "spilled back" and returned to that pasture. These cattle were either driven or hauled to the Poor Farm Pasture.

On the evening of May 10, Rick Barkell, Jr., and Christie Sanders, who was seventeen years of age, planned to attend a birthday party in the Modesty Gulch area. They left Anaconda together with Norman Motland at approximately 4:00 or 5:00 p.m. Their intention was to hunt gophers before they went on to the area where the party was to be held. They arrived at the Modesty Gulch area at approximately 8:00 or 9:00 p.m., where the party was under way. During the time they were at the party they both drank some keg beer. They remained at the party until approximately 12:30 or 1:00 a.m.

Returning home, Rick Barkell and Christie Sanders proceeded to Montana Highway 273 on a different road than the one they had traveled going to the party. Suddenly Barkell, who was driving the pickup truck, noticed a cow very close to the front of his vehicle. The cow was a truck-length to a truck-length and a half in front of him, moving across the road into his lane of traffic. Barkell, after attempting to swerve around the cow, hit it. At this point the pickup started to roll and ended up in a borrow pit to the left of the highway. Barkell found himself lying on the ground outside the pickup cab with the truck on his foot. He freed himself and looked around for Christie, who was lying behind him. She called his name and he told her to lie still and he then went for assistance. Barkell left the scene of the accident, ran down to the Poor Farm to seek help and finding none he eventually caught a ride into Anaconda.

Highway Patrolman William Steiner investigated the accident. He arrived at the scene at approximately 2:30 to 3:00 a.m. and

discovered the body of the deceased Christie Sanders. After calling
an ambulance, he began his investigation which continued into the
following day.

The cow that was struck was a mature Black Angus owned
by the Mount Haggin Livestock Company. Plaintiffs, parents of
Christie Sanders, contend the negligence of the Mount Haggin
Livestock Company was the proximate cause of their daughter's death.

Defendant presents several issues on appeal. The first
issue contends defendant was entitled to a directed verdict or
in the alternative for a judgment notwithstanding the verdict, for
these reasons:

A. Defendant owed no duty to fence in the cow which had
wandered onto the highway; or

B. The evidence was insufficient to support the verdict
or judgment; or

C. The jury was improperly instructed on negligent herding
and damages.

We cannot agree with defendant's contentions on the first
issue. Plaintiffs established a prima facie case and the jury had
a right and duty to examine the evidence and to hear the testimony
of the witnesses. Sufficient testimony was brought before the
jury to establish a prima facie case of negligence; consequently,
the trial court did not err in refusing to grant defendant's motions.
Testimony was introduced as to whether or not the herding was done
in a negligent manner. Conflicts in the testimony existed, but the
jury was the ultimate finder of fact.

No one will dispute that Montana is an open range state.
This Court has many times so ruled. But, as with every rule of law,
definite exceptions do exist. The exception to the open range rule
exists when the animals in question are in charge of herders. This
Court stated this exception in Jenkins v. Valley Garden Ranch Inc.,

- 4 -

151 Mont. 463, 465, 443 P.2d 753, citing from Montgomery v. Gehring, 145 Mont. 278, 283, 400 P.2d 403:

> "'One releasing his livestock onto lands where he has a right to do so is under no duty to restrain them from entering another's unenclosed land. Such livestock owner is not responsible for damages occasioned by the entry of his livestock on such unfenced land through following their natural instincts. <u>The exception to this, of course, is willful or intentional herding or driving livestock onto another's unfenced land or placing them so near that trespass is bound to occur.</u>'" (Emphasis supplied)

In Estate of Bartsch, 149 Mont. 405, 427 P.2d 302, the Court plainly indicated that if an animal is willfully or intentionally driven onto the highway right-of-way a duty is created, the breach of which constitutes negligence. Here, the testimony and evidence presented clearly indicates that Mount Haggin may have willfully, intentionally and deliberately driven the animals upon the highway right-of-way and left them there once they had escaped from the control of the herders. There is nothing in the record to indicate that action was taken to warn motorists of the hazard that may have been created upon the highway. In this case, a duty may have been violated constituting negligence, and the trial court was correct in allowing it to go to the jury for final determination.

Defendant's second issue on appeal is whether or not the trial court erred in refusing to exclude the testimony of plaintiffs' witnesses whose identity had not been disclosed, despite interrogatories requesting their identity. We find such refusal was error.

A basic physical fact of this case was that the accident which took the life of Christie Sanders occurred in the Deer Lodge Valley near the old "Poor Farm", and that defendant had moved a herd of cattle past that farm, through an adjacent gate, shortly before the accident. This elementary fact was known to plaintiffs' counsel soon after they began investigation of the case.

Plaintiffs subsequently filed their complaint alleging defendant was guilty of negligently conducting a herding operation which caused the death of their daughter. Thereafter, discovery was initiated by counsel for plaintiffs and defendant. At the same time, plaintiffs' counsel employed a private investigator to interview witnesses or possible witnesses in the area where the accident occurred.

About one month after the accident, this investigator interviewed Ethel and Doug Davis, a married couple who live at the old "Poor Farm" and who subsequently became key witnesses for plaintiffs. The investigator, a police officer regularly employed by the city of Anaconda, interviewed Ethel and Doug Davis again two or three months later. They related to him the information they subsequently gave at the trial.

Months after this investigative activity by plaintiffs' counsel, counsel for defendant propounded and submitted interrogatories to plaintiffs and their counsel which requested inter alia, the following information:

> "INTERROGATORY NO. 59: Give the name, addresses, places of employment, home and business telephone, numbers, job titles and capacities and last known whereabouts of:
>
> "a. Any person known to you, your agents, employees or attorneys who witnessed the accident, or was in its vicinity before, at the time of or just after its occurrence * * *."
>
> "INTERROGATORY NO. 60: What is the name and address of each person who has knowledge of one or more facts or circumstances upon which you base your allegations of:
>
> "a. Negligence of the Defendant, but who did not actually see the accident;
>
> "* * *
>
> "c. Any other matters which relate to the accident or to damages or causation."
>
> "INTERROGATORY NO. 61: Have any persons made any statements, written or otherwise, while being interviewed or questioned by you or on your behalf, including your attorneys, insurance adjuster, agents

or representatives of your attorneys, in connection with the accident complained of?"

"INTERROGATORY NO. 62: If so, for each statement indicate:

"a. The name, address, occupation and relationship to you of the person taking it;

"b. The date of making;

"c. The place of making;

"d. Whether signed or unsigned; * * *."

"INTERROGATORY NO. 63: What is the name, last known address, present whereabouts, if known, of each person whom you or anyone acting in your behalf, including attorneys, agents, insurance adjusters, or other persons, knows or believes to have any relevant knowledge of the conditions at the scene of the accident existing prior to, at, or immediately after the same."

The names of Ethel and Doug Davis were not listed in the answers given to the above quoted interrogatories. These witnesses, whom the investigator discovered and interviewed, fell within the scope of the answers to the interrogatories which plaintiffs subsequently submitted to defendant, in that Ethel and Doug Davis were:

1. Persons who had "knowledge of one or more facts or circumstances upon /which" plaintiffs base their allegations of "a. Negligence of the Defendant". (Interrogatory No. 60).

2. Persons who had "knowledge of one or more facts or circumstances upon which" plaintiffs base their allegations of "c. Any other matters which relate to the accident * * * or causation." (Interrogatory No. 60)

3. Persons who had "made any statements, written or otherwise, while being interviewed or questioned by * * * agents or representatives of [plaintiffs'] attorneys * * *". (Interrogatory No. 61).

4. Persons whom plaintiffs "or anyone acting in [their] behalf, including attorneys, agents * * * or other persons, knows or believes to have any relevant knowledge of the conditions at

- 7 -

the scene of the accident existing prior to, at, or immediately after the same." (Interrogatory No. 63).

The investigator was not mentioned in the answers to these interrogatories as a person who knew, for instance, of the "conditions at the scene of the accident", although he interviewed people and took photographs.

Then, on September 10, 1970, some 46 days before the trial began, defendant propounded supplementary interrogatories to the plaintiffs. They requested that plaintiffs list all of the witnesses they intended to call at the trial and the names of "all persons from whom statements have been taken by attorneys, agents, investigators or any other persons on behalf of the plaintiffs and specify whether the statement is written or oral and the name of the person taking such statement." Plaintiffs, although required by Rule 33, M.R.Civ.P., to answer those interrogatories within 20 days, failed to respond.

Thus, despite the foregoing account of the investigation and discovery procedures by counsel the identity of Ethel Davis was not disclosed until four days before the trial. The identity of her husband, Doug Davis, was not disclosed to defense counsel until the morning of the trial. The trial began on Monday morning, October 26, 1970. On Thursday before the trial, counsel for defendant exchanged a list of witnesses with counsel for plaintiffs. At that time and for the first time, the identity of Ethel Davis was disclosed. When defense counsel asked for the address of witness Ethel Davis, he was informed she lived "somewhere out in the (Deer Lodge) valley." Some hours prior to this disclosure, counsel for plaintiffs had issued a subpoena for Ethel Davis directing her to appear and testify as a witness for the plaintiffs. Yet, a few hours later, counsel for the defense was advised that plaintiffs' counsel did not know where she lived.

The record shows the testimony of Ethel and Doug Davis came as a complete surprise to defendant. Defense counsel were forced to rely upon a transcript of a tape recording taken by counsel for plaintiffs and then, subsequently, a recording taken by two members of their own law firm who had no knowledge or background of the case. Neither Ethel or Doug Davis had been interviewed or deposed by counsel representing defendant prior to their actual appearance on the witness stand.

This situation justified and required the exclusion of the witnesses' testimony. A motion to exclude and disallow any testimony of these witnesses was made, supported, and elaborated upon with a complete statement of the surrounding facts. The trial court was in error to refuse this sanction for failure to make proper and accurate responses to interrogatories that were designed to elicit exactly the information which was withheld.

The interrogatories propounded to plaintiffs were continuing in nature and specifically stated the information requested of plaintiffs and their attorneys, and also extended to facts within the knowledge of the parties, their "agents and representatives". As the testimony at the trial and the affidavits submitted by plaintiffs' counsel clearly show, the investigator was an agent of the law firm of Knight, Dahood & MacKay, and conducted an investigation of the accident for that law firm. Mrs. Davis verified, in her own testimony, that she had told the investigator the same story she testified to at the trial. Plaintiffs' counsel considered her testimony most crucial to their case, and they argued to the jury that her testimony had a direct bearing on the question of whether Mount Haggin conducted negligent herding operations.

Counsel for defendant correctly cites Smith v. Babcock, 157 Mont. 81, 91, 482 P.2d 1014, as authority for excluding the

Davis testimony. In Smith, this Court held that the exclusion of the testimony of a witness should have been required when the party who introduced his testimony failed to supply the name of the witness in answer to an interrogatory which requested "names and addresses of all persons who have any knowledge or information relating to the accident or its cause."

Counsel for plaintiffs cite Wolfe v. Northern Pac. Ry., 147 Mont. 29, 40, 409 P.2d 528:

> "Rule 33, M.R.Civ.P., authorizing the use of interrogatories for purposes of pre-trial discovery from any 'adverse party,' although liberally construed to make all relevant facts available to parties in advance of trial and to reduce the possibilities of surprise and unfair advantage * * * cannot become a weapon for punishment or forfeiture in the hands of a party, or an instrument for avoidance of a trial on the merits. * * *."

The rule stated in Wolfe is valid and we agree with plaintiffs' interpretation; however, in Wolfe the Court also stated:

> "In interpreting these rules [Montana Rules of Civil Procedure] we will reverse the trial judge only when his judgment may materially affect the substantial rights of the appellant and allow a possible miscarriage of justice."

Under the facts here, we believe a possible miscarriage of justice has substantially affected the rights of defendant.

From the testimony given at trial, one readily discerns the importance of the testimony of Ethel and Doug Davis. Both testified they were able to observe the herding operation of the Mount Haggin cowboys and that it was carried on in a negligent and inefficient manner. Both testified that some of the cattle, as they were driven down the highway, refused to enter the Poor Farm (Swamp) pasture and either "stampeded" or "spilled back" to the Peterson Place. They also testified they believed that cattle were present on the highway the night of the accident. Due to the fact that Doug Davis had had a series of heart attacks he was unable to come to the courtroom, so the trial judge ordered the jury

to go to the residence of Doug Davis and his testimony was taken in the Poor Farm building which is located immediately adjoining the Swamp Pasture area.

This Court agrees with defendant's contention that the testimony of the witnesses Davis was crucial to the plaintiffs' case and from the verdict returned by the jury we are compelled to believe this testimony was significant to the jury during its deliberations. Since proper discovery procedures were not followed, we find the trial court did commit error in allowing the testimony of Ethel and Doug Davis.

Counsel for defendant made three formal objections during the course of the trial in order to obtain the quashing of the Davis testimony. The first objection was made immediately at the commencement of the trial:

> "MR. ROTH [Counsel for defendant]: Now, may it please the court. The Defendant will now object to the additional witnesses that have been listed by the Plaintiffs, and the use of their testimony in the trial of this case, on the ground and for the reason that at the pre-trial conference the names and addresses of all witnesses were to be exchanged between counsel for the parties at least ten days prior to trial, and this was agreed to by the parties. Now, then, your honor, the Plaintiffs had a duty in this case to prepare the pre-trial order, and it wasn't prepared within the time it was supposed to have been prepared, and so the names of these witnesses comes as a complete surprise to the Defendant, your honor, at this late date, for we have not had an opportunity to consult and investigage the testimony of Mrs. Ethel Davis, or the other additional witnesses named, Dick Harris, Dan Jancic, or Margaret Durkin."

This objection was overruled.

The second objection raised by Mr. Roth was at the time Mrs. Ethel Davis was about to testify:

> "MR. ROTH: May it please the court. Comes now the Defendant, Mount Haggin Livestock Company, in the cause now being tried before this court, and respectfully moves the court to quash and disallow any testimony of either of the witnesses, Ethel Davis and Doug Davis, upon the following grounds, and for the following reasons: (1) that the following interrogatories were propounded to the plaintiffs on November 21st, 1969, among which interrogatories were the following: Interrogatory Number 59: Give the names, addresses, places

of employment, home and business telephone numbers, job titles, and capacities, and last known whereabouts of: (a) any person known to you, your agents, employees, or attorneys, who witnessed the accident, or was in its vicinity before, at the time of, or just after its occurrence. Interrogatory Number 60: What is the name and address of each person who has knowledge of one or more facts or circumstances upon which you base your allegation of: (a) negligence of the defendant, but who did not actually see the accident; and, further, (c) any other matters which relate to the accident, or to damages or causation. Interrogatory Number 61: Have any persons made any statements, written or otherwise, while being interviewed or questioned by you, or on your behalf, including your attorneys, insurance adjuster, agents or representatives of your attorneys, in connection with the accident complained of. Interrogatory Number 62: If so, for each statement, indicate: (a) the name, address, occupation, and relationship to you, of the person taking it; (b) the date of making; (c) whether signed or unsigned. Interrogatory Number 63: What is the name, last known address, present whereabouts, if known, of each person whom you, or anyone acting on your behalf, including attorneys, agents, insurance adjusters, or other persons, knows or believes to have any relevant knowledge, of the conditions at the scene of the accident, existing prior to, at, or immediately after the same. (2) that answers to these interrogatories were received by the defendant on January 23, 1970, but that nowhere in the answers to the foregoing interrogatories was there any information with regard to the existence or whereabouts of Ethel Davis or Doug Davis. (3) that the identity of Ethel Davis and Doug Davis was known to the plaintiffs, and their attorneys, one month after the accident, through Mr. Daniel Jancic, an employee and agent of said attorneys, and again four months after the accident. (4) that counsel for the defendant have interviewed the said Mr. Daniel Jancic, the employee and agent of the attorneys for the plaintiffs, and the man who investigated the accident for Wade J. Dahood, and his firm, and that Mr. Jancic advised that he interviewed Mrs. Ethel Davis, and saw Doug Davis, at their farm, approximately one month after the accident, and, again, approximately four months after the accident, and that at each such interview, Ethel Davis told Mr. Jancic substantially the same things she told John L. "Luke" McKeon, and Mr. Jancic, on October 25, 1970, but, we submit, your honor, that the very first time the defendant was advised of the existence of Ethel Davis was on Thursday, October 22nd, 1970, at which time, in a conversation between Donald C. Robinson and David L. McLean, Mr. Robinson asked for the address of Mrs. Ethel Davis, and was advised in response to that inquiry that she lived 'somewhere out in the valley.' (5) we further submit, your honor, that recorded statements were taken from Ethel and Doug Davis, but that counsel for the defendant were not given a copy of these recorded statements until Tuesday, October 27th, 1970, and, of course, up to that time did not have an opportunity to interview either of these people. (6) that during the trial of this case, the counsel trying the case for defendant, Urban L. Roth, Donald C. Robinson, or, Robert J. Boyd, would not have time to personally interview said witnesses,

nor to carefully interrogate these witnesses on the statements that they had given to Mr. McKeon; (7) further, they would not have an opportunity to investigate the backgrounds of these witnesses to determine what animosity, if any, they held toward Mount Haggin Livestock Company, or any of its employees. (8) that they would not have an opportunity to prepare for an exhaustive deposition of these witnesses. (9) that Mr. Jancic had advised counsel for defendant, Urban Roth and Don Robinson, that the names of Ethel and Doug Davis were given to Wade J. Dahood at or shortly after the time he originally interviewed them. (10) that the Montana Rules of Civil Procedure, upon which the Montana Rules of Civil Procedure are patterned, require full and complete disclosure of all information requested in interrogatories propounded to one party by the other, and we respectfully submit to the court that certain sanctions may be imposed by the court where there is a violation of the spirit of the rules of procedure for discovery, and we respectfully move the court that such sanction be imposed upon counsel for the plaintiffs for their utter disregard and violation of this rule of procedure for discovery, and their failure to disclose this information, and based upon the information that I have just submitted to the court, we submit that this sanction is most appropriate under these circumstances."

This second objection was also overruled.

The third objection/the Davis testimony was made by Mr. Roth in his motion for a directed verdict:

"(9) Now, furthermore, your honor, we submit that the motion to quash the testimony of Ethel and Douglas Davis should be granted, and that the court, in determining the merits of Defendant's motion for a directed verdict, should completely disregard the testimony of Ethel and Douglas Davis, on the grounds previously stated in this record, that is, that the Plaintiffs, and their attorneys, failed to respond to specific interrogatories, which would have disclosed the names and existence of Ethel and Doug Davis months before the trial of the case, and that there was absolutely no excuse for their failure to name Ethel and Doug Davis in response to interrogatories, and that their testimony should be completely disregarded in ruling on the motion for directed verdict.

This third objection was also denied.

From this record, it is clear that defendant's counsel took every opportunity to object to the Davis testimony. All these objections, even though well taken, were denied by the trial court. Mr. Roth did all that a counsel could do under the circumstances to exclude the Davis testimony. He correctly believed that any further objection would hinder his client's case; therefore, he decided to raise this error on appeal. This Court will correct this error. A new trial is ordered.

In conclusion, we believe it necessary to mention one other issue. Since this case is being remanded for a new trial, it is not necessary to fully develop the issue, however, it does merit some discussion.

That issue is damages. The jury returned a verdict in the amount of $96,140. This Court finds a strong possibility exists that the amount was excessive. In the record there is no evidence that Christie Sanders would have remained in the Anaconda area after graduation from high school; no evidence was introduced as to what her future plans were so far as residence or school; there was no evidence offered that she had ever given her family any pecuniary support or that she was motivated in that direction; and, very little evidence was offered as to the relationship between her and her parents. The paucity of evidence as to damages indicates a strong possibility the verdict was prompted by passion and prejudice; or, the jury was improperly instructed as to the proper criterion of damages.

In Wyant v. Dunn, 140 Mont. 181, 368 P.2d 917, the Court recognized the universal rule that damages in this type of action are first presented to the sound discretion of the jury, then reviewed by the trial judge, who must set aside or modify the verdict on a motion for a new trial if the amount of the verdict is not just. Only in rare cases should a decision be reversed where the trial judge and the jury agree that the verdict is proper. The present factual situation suggests a strong possibility that this is such a case.

In Montana in a wrongful death action, such as this, damages as under all the circumstances of the case may be just may be recovered; but, a verdict for damages must be based upon admissible evidence. Krohmer v. Dahl, 145 Mont. 491, 402 P.2d 979; Davis v. Smith, 152 Mont. 170, 448 P.2d 133.

Nevertheless, though the amount of damages is solely within the province of the jury, the jury is not given carte blanche. Some substantial evidence must exist upon which the award of $96,140 can be predicated. In Miller v. Boeing Company, (D.C.Mont.1965) 245 F.Supp. 178, Judge Jameson, applying Montana law, concluded that a verdict of $52,700 to plaintiff widow for the wrongful death of her husband was excessive. The verdict was reduced to $37,500. The court noted that the Montana statute/involved was adopted from California and quoted from Ure v. Maggio Bros. Co., 24 Cal.App.2d 490, 75 P.2d 534, 538:

> "'But while loss of society, comfort, and protection may be an element of the injury sustained by the statutory beneficiaries, it is only the pecuniary, and not the sentimental, value of such loss which may be taken into consideration in the assessment of damages. Nothing can be recovered as a solatium for wounded feelings.'"

The court quoted further from Dickinson v. Southern Pacific Co., 172 Cal. 727, 158 P. 183, 185:

> "'It is not possible to measure in exact terms of money the loss which a surviving husband, wife, or child may have sustained through being deprived of the comfort and society of the deceased spouse or parent. For this reason, some play is allowed to the discretion of the jury by the provision of section 377 that such damages may be allowed, as under all the circumstances of the case may be just. But, in fixing the amount, the jury is always bound by the fundamental rule that pecuniary damage is the limit of recovery, and the amount allowed must bear some reasonable relation to the pecuniary loss shown by the evidence.'" (Emphasis supplied). See also: Section 93-2810, R.C.M. 1947.

The court further commented upon the duty of a judge to review a verdict and declare a verdict excessive when he conscientiously believes "that the jury has exceeded the bounds of propriety." Dellaripa v. New York, New Haven & Hartford R.Co., 257 F.2d 733, 735. After noting that the evidence as to the pecuniary value of loss of society, comfort, protection and companionship was inadequate, the court concluded that any recovery in excess of $37,500 was just not justified.

In two recent cases this Court considered verdicts for wrongful deaths of minors, Davis ---$4,000, Krohmer---$35,000, but in both cases substantial evidence was introduced as to damages. In the instant case we have a verdict of $96,140, almost three times the award in Krohmer, for the wrongful death of a minor unsupported by any evidence of earning capacity, support to the parents, or any damage other than loss of comfort, society, companionship, etc. The amount of the award can be accounted for only upon the basis the jury (1) was not properly instructed, (2) was given an improper standard in oral argument upon which to compute pecuniary value of loss of comfort, society and companionship, or (3) it was actuated and motivated by passion or prejudice.

The judgment is reversed and the cause remanded for a new trial.

*Wesley Castles*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Associate Justice

We concur:

_____

Chief Justice

_____

_____

_____

Associate Justices


Mr. Justice Daly and Mr. Justice Haswell, dissenting:

We dissent.

The majority grant a new trial to defendant because of failure of plaintiffs to list the names and addresses of two witnesses in response to defendant's pretrial interrogatories. It is clear that this failure constituted a violation of pretrial discovery rules. It is equally clear that the names of these witnesses were communicated by plaintiffs' counsel to defendant's counsel several days before trial; that the witnesses' exact address was not given but only that they lived somewhere in the valley; and that plaintiffs' counsel furnished defendant's counsel with a tape of the witnesses' statements and defendant's counsel interviewed them and had a transcript of the statements of such witnesses prior to their examination at the trial.

During the course of trial when plaintiffs called the first of such witnesses to testify, defendant moved to exclude the testimony on the grounds of surprise occasioned by plaintiffs' violation

of pretrial discovery rules and requested the court to impose

sanctions for such violation by excluding the testimony of such

witnesses.   The district court denied defendant's motion in the

following manner:

> "THE COURT:   Well, I am not going to invoke or impose this sanction, because I feel that this is pretty important testimony from their viewpoint.   The sanction will not be imposed, and the motion will be denied.
>
> "MR. ROTH: [defendant's counsel]  If your honor please, may we have the benefit of the use of a recorded statement that we have of this witness, which has not been transcribed as yet, and we would like the opportunity to review that testimony before her testimony is given, and we must cross examine.
>
> "MR. McKEON:  [plaintiffs' counsel]  We will have no objection to that.
>
> "THE COURT:   All right, that may be done, and this witness may be called at another time.   If that is all, then we can return to the courtroom.
>
> "   *  *  *
>
> "THE COURT:   All right, the record may show that the court is again in session, and in the presence of the jury.   You may proceed.
>
> "MR.McKEON:   Your honor, as the court knows, counsel for the defendant have advised that they have a statement which they took this morning of Mrs. Ethel Davis, and which has not as yet been prepared and transcribed, and they would like to have the advantage of this statement when conducting cross examination of Mrs. Davis, and so we would be very happy to wait and call Mrs. Davis tomorrow morning, so that they will have the advantage of that particular statement at that time.
>
> "MR. ROTH:   Yes, that is our position in this matter, if the court please.
>
> "THE COURT:   Very well, that may be done, and the witness may be called tomorrow morning.
>
> "MR. ROTH:  Thank you, your honor, and thank you, again, Mr. McKeon."

Following this colloquy, no further continuance was requested.

Defendant's counsel received his request for a day's delay in the

examination of these witnesses.   These witnesses were exhaustively

examined and cross-examined the following day. The case was submitted to the jury in this posture without further objection by defendant. The jury returned a verdict for plaintiffs.

Defendant moved for a new trial on the basis of surprise which ordinary prudence could not have guarded against. The district court denied defendant's motion for a new trial. The majority of this Court has reversed this ruling of the trial judge.

Section 93-5603, R.C.M. 1947, sets forth the grounds on which a new trial may be granted. Subsection (3) provides for a new trial where the moving party was surprised by the testimony offered at the trial. In Hill v. McKay, 36 Mont. 440,446, 93 P. 345, this Court set down the following criteria for granting a new trial on this ground:

> "* * * it is the general rule that a new trial will be granted on the ground of surprise, only when it is clearly shown that the movant was actually surprised, that the facts from which the surprise resulted had a material bearing on the case, that the verdict or decision resulted mainly from these facts, that the alleged condition is not the result of movant's own inattention or negligence, that he has acted promptly and claimed relief at the earliest opportunity, that he has used every means reasonably available at the time of the surprise to remedy the disaster, and that the result of a new trial will probably be different."

These criteria were cited with approval recently in Morris v. Corcoran Pulpwood Co., 154 Mont. 468, 465 P.2d 827.

In our view a party may not secure a one day continuance in the witnesses' testimony to prepare for cross-examination, fail to request a further continuance, permit the case to be submitted to the jury without further objection, and after an adverse verdict secure a new trial on the grounds of surprise. Under such circumstances the party seeking a new trial has not used every means reasonably available at the time of surprise to remedy the situation, one of the required criteria for securing a new trial on this ground. This is particularly true where, as here, the

trial judge has denied movant a new trial under these circumstances.

Additionally, the refusal of the trial judge to impose the sanction of exclusion is not an abuse of discretion here nor is it an independent ground for granting a new trial.

_Hon. O. Daly_

_Frank I. Haswell_
Associate Justices