No. 12536

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

DONALD R. BEEBE, Administrator
of the Estate of Dorothy Beebe
and Donald Beebe,

Plaintiffs and Appellants,

-vs-

RALPH JOHNSON and ALVIN F. SIHRER,

Defendants and Respondents.

---

Appeal from:   District Court of the Fourth Judicial District,
               Honorable Jack L. Green, Judge presiding.

Counsel of Record:

For Appellants:

McGarvey, Morrison, White and Hedman, Whitefish,
Montana
Frank B. Morrison argued, Whitefish, Montana
Christian, McCurdy, Ingraham and Wold, Polson,
Montana

For Respondent:

Korn, Warden & Walterskirchen, Kalispell, Montana
Merrit N. Warden argued, and Gary G. Christiansen
argued, Kalispell, Montana

---

Submitted: May 24, 1974

Decided: SEP 3 1974

Filed: SEP 3 1974

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff Donald R. Beebe secured a jury verdict in an action for damages for the wrongful death of his wife Dorothy and, in his representative capacity as administrator of her estate, maintained an action under the survival statute; and an action for personal injuries he suffered as a result of the same automobile accident which occurred in Lake County. Subsequently the district court of Lake County granted defendants a new trial. From the order granting defendants a new trial, plaintiff appeals.

The issues on appeal are:

1. Did the trial court err in failing to grant defendants' motion to set aside the verdict of the jury and enter a verdict for the defendants notwithstanding such verdict?

2. In the alternative, did the trial court err in vacating and setting aside the verdict of the jury and granting a new trial for one or more of the reasons set forth in the defendants' motion?

Plaintiff brought the action (1) as administrator of his wife's estate for the wrongful death of his wife, (2) as administrator of his wife's estate under Montana's survival statute section 93-2824, R.C.M. 1947, and (3) for personal injuries to himself in the same accident. The jury awarded him this verdict:

"To the estate of Dorothy Beebe, the sum of ...$33,705.65

"To Donald R. Beebe, as Administrator in his representative capacity for the heirs of Dorothy Beebe the sum of ......................$40,000.00

"To Donald R. Beebe, Individually, the sum of.. 3,304.77".

The automobile accident involved occurred midafternoon on February 24, 1969. The site of the accident was in front of the Elmo Store on U.S. Highway 93 in Lake County, Montana. Plaintiff and his wife had been to Kalispell on business and were returning home along the west shore of Flathead Lake when they came up behind two loaded logging trucks, which were also proceeding south. Dorothy Beebe was driving their 1966 Datsun automobile, while plaintiff was reading. Plaintiff testified he became aware of the

first logging truck ahead of them shortly after they came around a curve north of the Elmo Store and that after following the truck for a short distance, his wife pulled out into the lane to their left to pass the truck. He estimated that just prior to pulling out to pass, they had slowed down from 45 to 35 miles per hour and, in order to pass, his wife had shifted into third gear which speeded them up to between 50 and 60 miles per hour during the pass.

The first of the south bound logging trucks was driven by a Robert Hanson. The truck ahead of him was owned by Alvin S. Sihrer and was driven by Ralph Johnson, both defendants herein. Hanson testified he had followed the Sihrer truck for some time, traveling at about 55 miles per hour coming around the turn north of Elmo and into the straightaway. That at that speed he was catching up to the truck ahead, for it had begun to slow down. This caused Hanson to slow down to around 45 miles per hour and at the same time closed the distance between the two trucks to several truck lengths-- approximately 120 feet to 180 feet separating them just prior to the accident. Hanson further testified that at no time, from the top of the hill north of the Elmo Store to the point where the Sihrer truck turned off the highway in front of the store, did he see any brake lights or turning lights on the Sihrer truck. He indicated the rear of the Sihrer truck was visible to him at all times. He testified he had not seen the Datsun behind him until just prior to the accident and the first time he saw it the Datsun had pulled up alongside of the cab of his truck in the left or north lane of the highway. His testimony described what happened then:

> "Q. After you saw the Datsun, what movement, if any, did you/the Sihrer truck make? A. He was turning off.
>
> "Q. Where was he turning? A. Into the Elmo Store.
>
> "Q. Did you continue to watch him as he went into the turn?
>
> "* * * *
>
> "A. I was more or less watching the Datsun.

- 3 -

"Q. * * * During the time that the Sihrer truck was still on the highway, did you continue to watch him? A. Up until she went around him, yes.

"Q. And after she went around you, had the Sihrer truck turned across the center line? A. He had started across the center line when I first seen her.

"Q. At any time did you see any signal on the Sihrer logging truck?

"* * * *

"A. I did not notice any, no."

A summary of plaintiff's testimony notes that he was a passenger in the Datsun driven by his wife, and that prior to passing the first truck, driven by Hanson, his car had slowed down but in making the pass they speeded up to approximately 60 miles per hour. It was then he first noticed the Sihrer truck turning to the left into the lane of traffic they were using to make the pass. He testified the Sihrer truck was still in the southbound lane and that the front wheel of the tractor had just crossed over the center line. He further testified that as they pulled abreast of the Hanson truck and into full view of the Sihrer truck, just before the accident, he saw no lights indicating the Sihrer truck was turning to the left.

Plaintiff's wife, Dorothy, suffered multiple injuries which left her paralyzed from the waist down. She had numerous operations, spent considerable time in hospitals and ultimately died on November 16, 1970. Plaintiff suffered a broken arm and other injuries which hospitalized him for several weeks.

At the time of the accident plaintiff operated a well drilling business in western Montana, operating two of his own rigs and leasing another. Because of the accident he was unable to continue in this business. His wife had been his office manager as well as housekeeper and mother of his children.

Johnson, driver of the Sihrer truck, testified that as he traveled south he saw the Hanson truck behind him; that as he came off the curve north of the Elmo Store, he decided he wanted something at the store so he made preparations to stop there; that he looked in his rear view mirror, saw that the Hanson track was a

reasonable distance away and saw another car behind the Hanson truck which he estimated to be a quarter to half a mile behind him; that he put his signal lights on and started to slow down; that he began crossing the center line and as he did so he heard no horn or any sound in the area as he pulled off the road to park before the Elmo Store. He testified as to what occurred at that time:

"Q. Did you ever see or did you look again in your rear view mirror while you were in the course of turning into the Elmo Store? A. Yes, I did.

"Q. And where was your truck at that time? A. The tractor itself was pretty well off the highway and the trailer was say, in the left hand lane. It was just about to leave it and onto the driveway.

"Q. Your tractor was just about off? A. It was off. The trailer was in the left hand lane.
"Q. In the northbound lane? A. Right, approximately.

"Q. And did you look in your rear view mirror at that time? A. Yes, sir, I did.

"Q. And what did you observe? A. I observed the red Datsun at that time as near as I can recall right alongside the Hanson truck.

"Q. And how far behind you was Hanson's truck at that time. A. Oh, I would say maybe three, maybe four lengths.

"Q. Truck lengths? A. Yes. Truck lengths. He gained a little maybe, not much. It was pretty hard to tell in the mirror.

"Q. Well, what action did you take if any? A. Well I had to keep going. I didn't dare stop or anything. So I went on into the parking lot, pulled in along the parking lot there, which is a guard rail and as I started to get out I seen--

"Q. I will get to that in just a moment. A. --things happened.

"Q. I suppose--was it necessary for you to--it may sound like a stupid question and it is, but was it necessary for you to slow your truck down? A. I had to slow my truck down quite considerably.

"Q. And was your truck going fast or slow then when you saw this Datsun this second time as you were pulling into the parking area in front of the Elmo Store? A. I was getting pretty slow.

"Q. Is it easy to stop a load that big in a short distance? A. No, it isn't.

"Q. When you have to slow it down? A. You have to bring it down pretty gradually.

"Q. Alright. Then you proceeded on into the parking area in front of the Elmo Store? A. Uh huh.

"Q. You did bring your truck to a stop? A. Yes, I did.

"Q. And then what did you do or what happened? A. Well, that is when I started to get out.

"Q. And then what happened? A. Well, I seen a hub cap and I knew something had happened back there but I didn't know what.

"Q. Did you hear any noise? A. Well, I did after I opened the door where I could.

"Q. And what kind of noise? A. It sounded like a bunch of rattling beer cans or something rolling down the road.

"Q. What did you do? A. Well, I proceeded to get on out of the truck.

"Q. Did you look around or anything? A. Yes, I looked just through the window on the other side and I seen this car come rolling down the road.

"Q. Was there anything ahead of the car rolling down the road that you saw? A. A bunch of pieces.

"Q. What do you mean pieces? Could you identify them? A. Windshield, hubcaps.

"Q. And describe how the car was rolling. Was it rolling end over end or sideways or what? A. It would be sideways like this (indicating).

"Q. And how many times did it roll that you saw? A. Well, as far as I could tell about three from where I was at.

"Q. Did you observe any people in connection with that car? A. Yes, after I was out and saw the car I run around the front of the truck and she was thrown, the lady was thrown out in the middle of the highway."

Concerning the signal lights, Johnson testified they were on for some five or six truck lengths (300) feet before he got to the Elmo Store turnoff and were on after the accident.

On cross-examination Johnson testified the side mirror was positioned in such a way that when the truck was straight in the road you could look behind and see straight behind; that his trailer was just ready to break off the highway when he saw the Datsun alongside the Hanson truck; and that he was in that position when he, at an angle, saw the Datsun car.

There was conflict in the testimony concerning the position of the Sihrer truck at the time the Datsun began its turnovers. Defendants' witnesses maintained the truck was in the Elmo Store parking lot at the time the accident occurred. Hanson, the other truck driver, disputes that testimony maintaining that only a portion of the Sihrer tractor (cab) was over the center line when he first

- 6 -

observed the Datsun alongside his cab; that the Datsun darted in between the front of his truck and the rear of the Sihrer truck; and immediately thereafter the Datsun's right wheels went off the shoulder of the hardtop traveling thusly for some distance before rolling over three times.

These disputed facts and others presented by the various witnesses were presented to the jury, which returned a verdict for plaintiff.

The principal issue before this Court is whether the trial court erred in granting defendants a new trial.

In Morris v. Corcoran Pulpwood Co., 154 Mont. 468, 474, 465 P.2d 827, this Court in discussing a denial of a motion for new trial cited Campeau v. Lewis, 144 Mont. 543, 398 P.2d 960:

> "'Several of the cases cited by the respondent deal with a denial of a motion for a new trial and then an appeal to this court. In such cases the court has been somewhat reluctant to set aside an act of discretion of the trial judge. In the Tripp case [Tripp v. Silver Dyke Mining Co., 70 Mont. 120, 224 P. 272], for example, this court refused to disturb the trial judge's decision to deny the motion for a new trial. However, in the instant case the trial judge did grant a new trial, thereby choosing not to follow the finding of the jury. When the trial court denies a motion for a new trial and thereby indicates faith in the jury verdict we are more apt to refrain from disturbing that order than where the trial judge sets aside the jury's findings and requires that the facts be decided again. Where the trial judge is presented with evidence in favor of the verdict, but proceeds to grant a new trial, we feel it is our duty to test the evidence against the verdict. We respect the discretion of the trial judge, but are of the opinion that in this case he was unreasonable in granting the new trial. Of course, the advantageous position of the jury to resolve the facts does not remain when they return an "incredible" verdict. Casey v. Northern Pacific Ry. Co., 60 Mont. 56, 198 P. 141; Cf. Adami v. Murphy, 118 Mont. 172, 164 P.2d 150, where the verdict for the defendant was an incredible one. However, in the instant case there is nothing incredible about the verdict for the defendant.'"

Such is the case before us; we find nothing incredible in the verdict for the plaintiff.

In Campeau this Court expressed its respect for the discretion of the trial judge and its reluctance to disturb a ruling for a new trial, but that this Court will disturb an order granting a new trial when it appears there is substantial evidence presented to support the verdict. O'Brien v. Great Northern R. Co., 148 Mont. 429, 421 P.2d 710: Estate of Maricich, 145 Mont. 146, 400 P.2d 873.

Because we do not have the benefit of the trial court's reasons for granting the new trial we will examine defendants'

motion for new trial and the reasons for such presented therein.

Defendants' principal argument before the trial court and this Court was that the case should not have gone to the jury because of contributory negligence by the Beebes. At the close of plaintiff's case, defendants made a motion under Rule 12(f), M.R.Civ.P., to strike certain contentions made by plaintiff in the pretrial order and for an order dismissing the action on the grounds plaintiff had shown no right to relief. The trial court granted one of the motions before trial but denied all others. Essentially defendants made the same argument for judgment notwithstanding the verdict or for a new trial, towit: That the evidence was insufficient to submit the case to the jury or to justify the verdict. During argument both counsel stated that if the case were sent back for retrial there would be no new evidence, for the case had been fully and ably submitted.

Defendants also contend in their motion for a new trial, that there is no support in the evidence for three allegations of negligence made by plaintiff contained in the pretrial order. The court overruled defendants' motions to strike the three allegations which were: (a) failure to signal a left hand turn; (b) failure to yield the right-of-way to the vehicle operated by plaintiff's decedent and in which plaintiff was a passenger; and (c) failure to keep a proper lookout.

All three of the allegations listed are covered, in the most part, by the testimony of the two truck drivers and plaintiff. Robert Hanson, the driver of the truck following the Sihrer truck was the key witness. He was a totally disinterested witness who had a "ring-side" seat and throughout his testimony both on direct and cross, he said he saw no turn lights on the Sihrer truck. This testimony is corroborated by plaintiff's testimony who admittedly was not paying too much attention to either truck until the car in which he was riding came abreast of the Hanson truck. In addition, defendant Johnson admitted his tail lights had mud on them.

The jury could well have believed this testimony and have found that the operations of the Sihrer truck violated two Montana statutes,

section 32-2167, R.C.M. 1947, turning movements and required signals; and section 32-21-133(b), R.C.M. 1947, display of lamps.

As to (b), the failure to yield the right-of-way, and (c) failure to keep a proper lookout, the Hanson testimony could be controlling insofar as the jury was concerned. His testimony was to the general effect that when the Datsun was alongside his cab, the Sihrer truck's cab had just crossed over the center line and if this was the situation the driver of the Sihrer truck clearly violated Montana's right-of-way statute, section 32-2121, R.C.M. 1947.

The allegations of failure to yield the right-of-way and failure to keep a proper lookout were submitted to the jury. Right-of-way is defined by section 32-2121, R.C.M. 1947, as being "The privilege of the immediate use of the roadway." The jury could well have concluded from the evidence that the Datsun was in the passing lane a sufficient time prior to the time the Sihrer truck turned across the center line or that had the driver looked back he could have turned to the right to allow the Datsun to pass. In addition, the testimony of driver Johnson that his side mirror focused straight back and that he saw the Datsun after he had turned raised a question of how credible his testimony was as to the fact he saw the Datsun in the mirror.

A Ninth Circuit Court case, Bellon v. Heinzig, 347 F.2d 4, 6, applying Montana's section 32-2167, R.C.M. 1947, in a passing case, said:

> "* * * Does ordinary care require a driver to look to the rear when he is preparing to turn left, even though he is in a no-passing zone? It has been held it does [citing cases], and we are not aware of any contrary holdings."

In an Idaho case similar to the instant case, Madron v. McCoy, 63 Idaho 703, 126 P.2d 566, 570, the Idaho court stated the duties of turning motorists. There the truck had slowed down, as in this case, and as here did not give a turning signal. The court said:

> "It would seem that this conduct, on the part of the driver of the cattle truck, was tantamount to saying to the driver of any following truck, that he was slowing

up to allow the latter to pass, -- at least until he reached the line of intersection. It would have been otherwise had he, at any time given a signal of intention to turn either to the right or the left. The very fact of reducing his speed, to two-fifths of his previous speed, in the space of 200 feet without giving any sign or signal, would indicate to the average driver following him, that the one so reducing his speed was intending to allow the following car to pass. The law required him to see and know, when he started to turn, that a car was following him; and what the law requires him to know, it will assume that he did know." (Emphasis supplied.)

With respect to a proper lookout, the trial court properly instructed the jury. Court's Instruction No. 20 reads:

"You are instructed that prior to making a left hand turn across a lane of traffic on an open highway, the operator of the motor vehicle so turning, must keep a lookout both ahead and to the rear to determine if there are other vehicles in the lane of traffic across which he intends to turn * * *".

See: Holland v. Konda, 142 Mont. 536, 385 P.2d 272.

We find no merit to defendants' objections to the pretrial order, nor does it serve as a basis for granting defendants a new trial.

We next consider the court's giving of an imminent peril instruction. Court's Instruction No. 15 is taken from BAJI 4.40, California Jury Instructions, and reads:

"A person who, without negligence on his part, is suddenly and unexpectedly confronted with peril arising from either the actual presence of, or the appearance of, imminent danger to himself or to others, is not expected nor required to use the same judgment and prudence that is required of him in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise only the care that an ordinarily prudent person would exercise in the same situation. If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by any ordinarily prudent person under the same conditions, he does all the law requires of him, although in the light of after-events, it should appear that a different course would have been better and safer."

The defendants object to the trial courts granting an instruction on "sudden emergency" alleging that in doing so the court was in error due to the fact that the driver of the Datsun was negligent. We disagree for under the fact situation here the

- 10 -

driver of the Datsun was not negligent, a fact to be decided by the jury, for she was legally passing when she suddenly was confronted with the respondent's truck turning in front of her vehicle. As will be developed hereafter she could not apply the brakes and avoid hitting the turning truck ahead. So she chose to dodge in between the two trucks in hopes of avoiding the collision. We can think of no clearer set of circumstances for the giving of an instruction on "sudden emergency" than we have before us here.

Here, from testimony given by several witnesses plus measurements, made by a highway patroman who arrived shortly after the accident, the jury could have found that the Datsun was passing the Hanson truck; that the Hanson truck was some 120 to 180 feet behind the Sihrer truck; that the gap was closing; and, that Sihrer's truck began to turn left over the center line in front of the Datsun. That the Datsun, if it was traveling 60 miles per hour, would have required 240 feet of skid marks, plus 132 feet of perception and reaction time, making a total of 372 feet for a total stopping distance. Most certainly, under these facts, instructing on imminent peril was proper. See March v. Ayers, 80 Mont. 401, 260 P. 702; Bogovich v. C.M.St.P. & P.R.Co., 122 Mont. 312, 203 P.2d 971.

Defendants' objected to allowing expert testimony relative to the stopping distance of a 1966 Datsun traveling at 60 miles per hour. Defendants, throughout the trial, contended that the decedent driver of the Datsun was negligent in the operation of the automobile. Plaintiff introduced testimony of a Dr. Mark Jacobson, Chairman of the Physics Department of the University of Montana, to show that when decedent was confronted with the turning truck had she chosen to make a full brake application, she would not have stopped before striking the truck. The purpose of such testimony was to show in retrospect that decedent chose the correct avenue of escape by attempting to maneuver the car to her right and to pass to the rear of defendants' truck.

- 11 -

> a public street or highway to exercise ordinary
> care at all times to avoid placing himself or
> others in danger; and to use like care to avoid
> an accident; to keep a proper lookout for traffic
> and other conditions to be reasonably anticipated
> and to maintain a proper control of his vehicle."

See Hanson v. Colgrove, 152 Mont. 161, 447 P.2d 486; Gunderson v.

Nolte, 153 Mont. 208, 456 P.2d 282; Fawcett v. Irby, 92 Ida. 48,

436 P.2d 714. In addition, we note that defendants' proposed

instructions which were refused were neither applicable to the

facts nor the law of Montana.

Also in their motion for new trial defendants questioned

whether the jury was properly instructed on the weight to be given

the testimony of various witnesses. The trial court chose to give

two "cautionary instructions" following the guidelines of "Montana

Jury Instruction Guide". These were court's Instructions No. 3

and No. 5, which fully instructed the jury on the weight of

evidence. Defendants requested their proposed instruction No. 31,

which was refused. This was a discretionary matter for the trial

court and there was no error.

Did the trial court err in permitting the damage testimony

offered by plaintiff?

Prior to Krohmer v. Dahl, 145 Mont. 491, 495, 402 P.2d

979, this Court was aware that in most wrongful death actions

the problem of determining the value of a decedent's services was

both difficult and often speculative. In Krohmer, recognizing

the need to assist the jury in its task, this Court held:

> " * * * It appears to us that in this particular
> case the element of conjecture is reduced significantly
> by the admission of expert testimony as to the possible
> future of the decedent. It also appears that this
> expert testimony is not only the best evidence but the
> only evidence available in this case to prove future
> earnings."

A hypothetical question was asked Dr. Jacobson based on the weight of the Datsun, the assumed speed, a full brake application, plus the roadway conditions at the time. Dr. Jacobson using as the coefficient of friction to be used in his equation .55 for a well traveled highway and .6 for a less traveled road, was able to compute the skidding distance to be 240 feet for the .55 coefficient of friction and 210 feet for the .6. Defendants' objection was based on the assumption the car was traveling 60 miles per hour and that there would have been a full application of the brakes. We find no error for the question was asked to refute defendants' allegations of contributory negligence and there was testimony the car was traveling about 60 miles per hour.

Defendants' next contention is the failure of the trial court to give an instruction on assumption of risk. The defendants allege error in the failure of the trial court to instruct the jury on the "assumption of risk". We find no error for here plaintiff was legally attempting to pass, in a clear passing lane with no oncoming traffic and could in no way have assumed that the lead truck would turn into her lane. This Court in Hanson v. Colgrove, 152 Mont. 161, 447 P.2d 486, speaking on the elements of "assumption of risk" doctrine said:

> " * * * This defense requires (1) knowledge, actual or implied, of a particular condition creating the risk, (2) appreciation of this condition as dangerous, (3) a voluntary remaining or continuing in the face of the known dangerous condition, and (4) injury resulting as the usual and probable consequence of the dangerous condition."

Here the facts fall far short of meeting these elements and we find no error in the courts not instructing on "assumption of risk" See Gunderson v. Nolte, 153 Mont. 208, 456 P.2d 282; Fawcett v. Irby, 92 Idaho 48, 436 P.2d 714.

However, the court did give an instruction on contributory negligence and along with it gave its Instruction No. 18 which fully covered the duties of decedent:

> "It is the duty of the driver of any vehicle using

Here, following the statutory requirements of section 93-2810, R.C.M. 1947 (Montana's wrongful death statute), and the holding in Krohmer the plaintiff sought to establish the value of the services of his wife as:

1.  Services contributed to the well-drilling business.

2.  Domestic services contributed by decedent.

Plaintiff's witness Douglas Stam, manager of the Polson State Employment Service, testified that considering the services rendered to the business the going rate to replace a person such as decedent would be about $350 per month and if the replacement had five years experience, as had decedent, the wage rate would be about $500 per month. The same witness testified that domestic work was $2 per hour in the Polson area. With this testimony before the court, plus plaintiff Beebe's estimate of the personal expenses of decedent, expert witness Dr. George B. Heliker was called. Dr. Heliker is a professor of Economics at the University of Montana whose specialization is labor economics.

This Court in Krohmer in accepting his expert testimony added another dimension to Dr. Heliker's career, for since that time he has appeared in numerous cases in Montana. In the instant case, using the methods and formulae approved in Krohmer, and with the foundational testimony of witnesses Stam and Beebe, Dr. Heliker testified that the loss of services both domestic and to the business, totaled $213,000. The jury returned a verdict of $40,000. See: Resner v. Northern Pacific Railway, ____Mont.____, 505 P.2d 86, 30 St.Rep. 55. We find no error for this presentation is in accord with Krohmer and Resner.

We have carefully examined defendants' objections to the trial court's failure to give certain of their proposed instructions, numbers 20, 25, 30, 31 and 36, and find no error. These instructions are either repetitious or were not applicable to the law or the facts of this case.

For the foregoing reasons none of the grounds enunicated in

defendants' motion for new trial authorizes a new trial. Accordingly, the order of the court granting defendants a new trial is vacated and set aside. The jury verdict in favor of plaintiff and the judgment are affirmed.

_____
Justice

We Concur:

_____

_____
Justices.

- 15 -

Mr. Justice Wesley Castles dissenting:

I dissent.

The statement of facts in the majority opinion is not inaccurate, but it is tailored to fit the result reached.

All vehicles involved in this matter were proceeding in a southerly direction on U.S. Highway 93 from various points north of Elmo, Montana. As that highway approaches Elmo from the north, it travels for at least a mile and a half or two miles in a westerly direction before entering a broad, sweeping curve to the left at the outskirts of Elmo. From this curve, the highway extends in a straight line southerly for a distance of more than a mile, passing through the small settlement of Elmo. The "Elmo Cash Store" fronted on the highway, facing west, a considerable distance south of the curve. This accident took place almost in front of that store.

Defendant Johnson was a truck driver employed by the defendant Sihrer and was driving a Sihrer truck and trailer loaded with logs from a logging area some twenty miles north of Elmo. Robert Hanson was driving his own loaded logging truck also in a southerly direction on Highway 93 and came up behind the Sihrer truck some two or three miles north of Elmo on the straight stretch of highway before reaching the curve and followed it around the curve and into the town of Elmo. After rounding the curve, Hanson became aware of the fact that the Sihrer truck was slowing down to turn into the Elmo Store. Both logging trucks were slowing at that time.

The Beebe car, a small foreign make called a Datsun, came up behind these two logging trucks at some point and at some unknown rate of speed. The plaintiff testified that he was a passenger with his wife driving and paid little, if any attention to her driving as he was engaged in reading some material. He

- 16 -

first observed the Hanson truck just shortly before the accident. At no time was Hanson aware of the Datsun following or approaching from the rear until it suddenly appeared, without warning and without sounding its horn, by the left front fender of his truck as it was attempting to pass.

Highway Patrolman George Goggins, a witness for the plaintiff, testified that the driver of the Hanson truck, another plaintiff's witness, told him that the Sihrer truck was some 250 to 300 feet ahead of the Hanson truck when the Datsun appeared by his left front fender. Notwithstanding this substantial distance, the evidence establishes that the Datsun made an abrupt turn to the right, at such speed that its left tires left a definite mark in the roadway for a distance of some 176 feet which mark proceeded to the right shoulder of the highway where the marks indicated that the vehicle had been sharply turned to its left, overturned and rolled over and over an additional distance of some 228 feet before coming to a stop.

Defendant Johnson, driving the Sihrer truck, testified that after rounding the curve on the highway he started to slow down to turn into the Elmo Store as it was his intention to obtain some cigars and a Coke. At that time the Hanson truck was three or four truck lengths behind him -- some 100 to 240 feet. He glanced to the rear in his mirror and saw another vehicle about a quarter of a mile behind him coming around the curve. He turned on his signal for a left turn and crossed over the center line. When the tractor of his rig was off the highway and into the driveway of the store he observed the Datsun attempting to pass the Hanson truck. By the time his rig had completely cleared the road and came to a stop the Datsun then was observed rolling past the truck and down the highway.

Two impartial witnesses in the Elmo Store, Mr. and Mrs.

Unzur, saw the Sihrer truck pull off the highway into the driveway of the store and stop. Just as it stopped and the driver got out, they saw the Datsun car rolling down the highway. This testimony verified the testimony of Johnson.

In addition to the testimony of defendant Johnson that he started his left turn across the center line, with his left turn signal lights on, plaintiff's witness Hanson testified that when he first observed the Datson by his left front fender, the Sihrer vehicle was well over the center line into its left turn. A sketch made by Hanson the day following the accident of the relative position of the vehicles shows the position of the Sihrer truck to be well over the center line and into its turn into the store driveway at the time the Datsun appeared by the front of the Hanson truck.

There was no evidence at any time that the driver of the Datsun ever applied any brakes or attempted to slow down.

Following the accident the left turn light on the left mirror of the Sihrer truck was still activated and blinking.

Under the rules concerning new trial granted in Garrison v. Trowbridge, 119 Mont. 505, 177 P.2d 464; Brennan v. Mayo, 100 Mont. 439, 50 P.2d 245; and Tigh v. College Park Realty Co., 149 Mont. 358, 427 P.2d 57, we have said that the trial court will not be reversed except on a manifest abuse of discretion. The majority opinion does not discuss nor distinguish these cases; but relies on Campeau v. Lewis, 144 Mont. 543, 398 P.2d 960, to decide in this case that "there is nothing incredible about the verdict for the defendant."

Analyzing each of the grounds for both a motion for a judgment notwithstanding the verdict and a motion for a new trial shows clearly that the trial judge did not abuse his discretion and there was no manifest abuse of discretion.

- 18 -

The various contentions of the plaintiff and what this Court relied on to weigh the testimony and find that the verdict was not incredible show clearly that there is a serious lack of proof on plaintiff's part including the failure to signal a left hand turn, the failure to yield the right of way, failure to keep a proper lookout. All of the evidence, fairly appraised, shows that it was wholly insufficient to justify the verdict; and even more, the trial court should have stricken plaintiff's contention at the close of plaintiff's case. Yet, the majority opinion by taking the evidence most favorable to plaintiff, finds that the verdict was not "incredible". This would seem to be a new standard for orders granting new trials and would seem to eliminate any trial court discretion. The majority does not overrule or distinguish Garrison, Brennan or Tigh, supra.

Strangely, the majority uses an Idaho case, Bellon v. Heinzig, 347 F.2d 4, a federal case, to support its result, but that case is clearly distinguishable. Johnson did look to the rear. He had no reason to anticipate that the driver of the Datsun would be completely inattentive to the most obvious logging truck making a turn. It goes without saying that a loaded logging truck making a left turn is conspicuous.

I would go further to say that, under the evidence here, the driver of the small foreign car was contributorily negligent as a matter of law. The physical facts speak more loudly than any witness and establish that the Datsun was moving at such a speed its driver could not control it and established clearly that the proximate cause of the accident was that of the driver's own negligence.

Much, much more could be said in this dissent as to why the district court was correct in granting a new trial, but it would be to no avail. This Court is apparently even approving

- 19 -

an instruction on "sudden emergency" where the plaintiff is clearly negligent. Even the majority opinion concedes that the negligence of the plaintiff was a jury question. If that be true, no sudden emergency doctrine should apply. On this ground alone, the trial court was correct in granting a new trial. The majority opinion does not even discuss this issue other than to reject it. Clearly here, the trial court did not manifestly abuse its discretion. Just what the rule may now be in this Court's review of a trial court's order granting a new trial is highly speculative.

_Wesley Castles_
_____
Justice