No. 84-397

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

AMIE BROWN, by Darold Brown,
her next friend,

Plaintiff and Respondent,

-vs-

LARRY MARKVE,

Defendant and Appellant.

---

APPEAL FROM:  District Court of the Sixteenth Judicial District,
In and for the County of Fallon,
The Honorable Alfred B. Coate, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Crowley, Haughey, Hanson, Toole & Dietrich, Billings,
Montana

For Respondent:

Huntley & Eakin; Gene Huntley, Baker, Montana

---

Submitted on Briefs:  May 9, 1985

Decided:  May 23, 1985

Filed:

MAY 2 3 1985

*Ethel M. Harrison*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Defendant appeals from the order of the Sixteenth Judicial District, Fallon County, granting a new trial. The District Court granted a new trial on the grounds that the $25,000 jury award to the plaintiff constituted inadequate damages. We reverse the District Court.

The only issue is whether the District Court erred in granting plaintiff's motion for a new trial after the plaintiff had received a jury verdict of $25,000.

Plaintiff had stopped her vehicle at a stop light in Baker, Montana. Her stopped vehicle was struck from the rear by a pickup truck operated by the defendant. Prior to the commencement of trial, defendant admitted liability for damages proximately caused by the accident. As a result, a trial was held on the issue of the nature and extent of the plaintiff's damages. Following the jury trial, a verdict for $25,000 was returned for the plaintiff. Judgment in that amount was entered. Plaintiff moved for a new trial and the District Court granted a new trial on the grounds of inadequate damages and insufficiency of the evidence to justify the verdict.

In holding that the verdict granted inadequate damages, the District Court concluded there was not sufficient evidence upon which to base an award of $25,000. Essentially this is no different than the conclusion that a new trial was granted because of the insufficiency of the evidence to justify the verdict. The standard to be applied upon the granting of a new trial and the consequent reversal of a jury verdict is stated in Nelson v. Hartman (Mont. 1982), 648 P.2d 1176, 1178, 39 St.Rep. 1409, 1412, as follows:

> "The District Court's second ground for granting respondent a new trial was that the jury verdict was contrary to the evidence. A trial court's

2

> denial of a motion for new trial is granted greater deference than a motion which has the effect of nullifying a jury verdict. This Court will not hesitate to reinstate the verdict which is supported by substantial evidence. Beebe v. Johnson (1974), 165 Mont. 96, 526 P.2d 128, citing Campeau v. Lewis (1965), 144 Mont. 543, 398 P.2d 960."

The test to be applied in the present case is whether the verdict of $25,000 is supported by substantial evidence.

In reviewing the Memo Opinion and Order of the District Court, we find that the district judge referred to the fact that in closing argument, defense counsel suggested to the jury that "a fair verdict would be $30,000." The court then concluded that this argument to the jury had the legal effect of an admission against interest which set the lower limits of the verdict at $30,000. No citation of legal authority is cited for that conclusion. In addition, the conclusion of the trial court contradicts its own Instruction No. 1 which in part stated as follows:

> "Statements of counsel are not to be regarded by you as evidence and you will disregard any such statements which are not supported by the evidence received upon this trial."

By his argument, the defense counsel obviously sought to encourage the jury to reach a lower verdict because of the presence of an admission of liability on the part of his client. However, that suggestion cannot be classed as evidence or an admission against interest which set a floor of $30,000 below which the jury could not go. The jury remained the finder of fact with the right to set the damages at $25,000 or such other figure as the jurors might conclude to be appropriate under the evidence.

We have examined the medical evidence submitted in behalf of both the plaintiff and the defendant. Well-qualified medical experts in the field of neurology testified for both the plaintiff and the defendant. The

3

evidence regarding the extent of the damages and the disability on the part of the plaintiff is sharply contradictory. As an example, the plaintiff's doctor testified that there were positive indications of a pyramidal tract disturbance in the plaintiff. This is claimed to be a response indicating involvement of the great pyramidal motor system somewhere between the brain and the spinal cord and can indicate a rather serious problem. In contrast, the neurologist testifying for the defendant stated that there was absolutely no sign of any pyramidal tract disturbance and totally disagreed that there was a positive Babinski sign which had been observed by the plaintiff's doctor. This type of conflict appears throughout the medical testimony involving the nature of the injury to plaintiff, and the extent of her disability.

Apparently the jury concluded that in certain medical aspects, testimony submitted in behalf of the defendant was more believable than that of the plaintiff. That was the function of the jury. As we review this evidence submitted in behalf of the defendant, we conclude that it was clearly substantial. The evidence which supports the verdict was presented by a well-qualified medical doctor, who was adequately examined and cross-examined to establish the contentions on the part of the defendant with regard to the nature of the injury and the degree of disability. We conclude that there clearly was substantial credible evidence to support the verdict of the jury.

We reverse the District Court and direct that the verdict shall be reinstated and judgment entered in accordance with the verdict.

Justice

4

We concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_Frank B. Morrison_

_L. C. Gulbrandson_ .

Justices

Mr. Justice John C. Sheehy, dissenting:

I would affirm the grant of a new trial by the District Court.

Mr. Justice Wesley Castles, in his dissent in Beebe v. Johnson (1974), 165 Mont. 96, 116, 526 P.2d 128, 138, complained that "what the rule may now be in this Court's review of a trial court's order granting a new trial is highly speculative."

Beebe v. Johnson is the founding case upon which Nelson v. Hartman (Mont. 1982), 648 P.2d 1176, 39 St.Rep. 1409, is based. Nelson v. Hartman is the case relied on by the majority in this case to determine that the grant of a motion for new trial is not entitled to the deference on appeal that traditionally is given to a denial of a motion for new trial.

Justice Castles had reason to be concerned. In Beebe, this Court determined that it would set aside a grant of new trial if this Court found "there is nothing incredible about the verdict," relying on Campeau v. Lewis (1965), 144 Mont. 543, 398 P.2d 960. This Court came to that rule by ignoring Tigh v. College Park Realty Company (1967), 149 Mont. 358, 427 P.2d 57 and Garrison v. Trolbridge (1947), 119 Mont. 505, 177 P.2d 464; and Brennan v. Mayo (1935), 100 Mont. 439, 50 P.2d 245, where we had established the rule that the trial court will not be reversed on a grant of new trial except upon a manifest abuse of discretion.

In Ployhar v. Board of Trustees of Missoula County High School (involving the same counsel) (1980), 187 Mont. 363, 609 P.2d 1226, this Court reverted to its prior rule:

> "The trial court has broad discretion in granting
> or refusing to grant a new trial. Its order will
> not be disturbed on appeal in the absence of a

- 6 -

> clear showing of a manifest abuse of discretion.
> See Yerkich v. Opsta (1978), 176 Mont. 272, 577
> P.2d 857. This Court is especially reluctant to
> reverse an order granting a new trial because it
> gives both parties an equal chance to relitigate
> their positions in a second trial. Tigh v. College
> Park Realty Company (1967), 149 Mont. 358, 427 P.2d
> 57. An order granting a new trial will be upheld
> if it can be sustained on any of the grounds
> contained in the order. Tigh, supra." 187 Mont.
> at 365. (Emphasis added.)

In Nelson v. Hartman, in 1982, we seem to have backed off again to the position in Beebe, although Nelson v. Hartman does not really contain any standard for review with respect to a grant of a new trial. I regret that when I joined in the opinion in Nelson v. Hartman, I did not perceive that the opinion could be construed as suggesting a lesser standard of review than manifest abuse of discretion in determining the propriety of a district court's order granting a new trial.

In the federal court system, there is no appeal from the order of a federal district court granting a new trial. The federal theory is that since the issues will be relitigated in the new trial, no party is aggrieved until a final judgment is entered. We do not, therefore, have from the federal system a body of law to which we could advert to determine a generally-accepted rule for review in this jurisdiction where an appeal is allowed from a grant of new trial.

In every other instance, we give deference to the orders and decisions of a district court in the course of a trial. Its ruling on evidence will generally be sustained; its decisions as to whether jurors should be excused, where venue should lie, whether issues will be tried at once or separately, are regarded with respect on appeal. In a bench trial, its findings of fact will not be set aside unless they

are "clearly erroneous." There is no logical reason to say that in this one instance, the district judge's decision must give way if there is "substantial" evidence, an ephemeral term at best.

If we are to abandon the rule of review requiring "manifest abuse of discretion" in this type of appeal, we should still place the burden upon the appellant to take the laboring oar where a new trial grant is appealed. At least the rule should be that in an appeal from an order granting a new trial the appellant must affirmatively establish that the reasons stated in the order for a new trial do not justify a new trial. See Santanello v. Cooper (Ariz. 1970), 475 P.2d 246, 248. It offends my view of appropriate appellate procedure that the respondent, under the view here, must affirmatively justify the District Court's order and not the appellant. That is really the effect of this decision.

A further reason that we should determine an appropriate standard of review in this type of case is the example we get from this case itself. The majority have turned themselves into fact-finders, weighing medical evidence, and, as I will suggest, weighing it inadequately.

As the District Court pointed out in its memorandum and order granting the new trial, the $25,000 verdict here included $13,000 in special damages, which were uncontested by the defendant. That means that the jury awarded the meager sum of $12,000 for pain and suffering (past and future), loss of ability to lead a normal life, and possible loss of earning capacity.

I think the jury totally rejected the testimony of defendant's medical witness, Dr. Smith. Let me explain why.

Amie called on her behalf Dr. Keilman, a chiropractor from Glendive, Montana. Amie had been his patient from August 23, 1980. She had stiffness of the lower back, thoracic cervical tension, nervousness and an elbow problem. He saw her several times between 1980 and February 9, 1981. He stated that on her last visit to him she described her health as "fantastic" and that as far as he was concerned, she had recovered full health in February of 1981.

Amie's accident occurred on February 22, 1981. On February 23, 1981, she again came to his office complaining of severe head pain and tired neck. She related those complaints immediately to the injury sustained in the collision, where she was rammed from behind by the truck. Dr. Keilman testified that in the nine years that he had been practicing, she was probably the most severely injured patient he had ever had in his office. She was hurting to the point that she could no longer support her head with her own muscles. She was holding her head with her hands because her neck was too tender and too sore. His x-rays revealed that Amie had a loss of lordotic curvature, in other words, her neck spine had straightened out instead of presenting the normal curve. His diagnosis was her neck was sprained with constant pain, and laceration of the entire "spacious" ligaments in the area of C-1 to C-5.

Amie's second medical witness was Dr. Richard Nelson of Billings, a specialist in neurology. He described neurology as that branch of medicine that studies the normalities and abnormalities of the nervous system, including the anatomy and physical functions of the brain and spinal cord and their relation to all the nerves and organs of the body system. In his physical examination of Amie, on March 22, 1983, 13

months following the accident, he found a Babinski response from which eventually he determined that Amie had a cervical sprain which affected the pyramidal motor system somewhere between her brain and her spinal cord, and also a possible thoracic syndrome. To eliminate other causes, he had CAT scans taken, to remove the possibility of subdural hematoma and cervical spine degeneration, and other tests to exclude multiple sclerosis as a possible cause of her difficulty. He also caused thermograms to be taken which he testified confirmed his diagnosis. He further indicated that Amie's condition was chronic, that he could not predict at what point in time she would find relief from her pain. At trial, he demonstrated a Babinski response by conducting the test on Amie before the jury.

Dr. Maurice Camp Smith, a Billings neurological surgeon, testified by deposition, on behalf of the defendant. Dr. Smith found no Babinski response, and ridiculed what Dr. Nelson found, saying:

> ". . . She told me that Dr. Nelson had said that she had a Babinski response. Now this is a pathologic response indicating involvement of the great pyramidal motor system somewhere between the brain and the spinal cord, and it was rather—would indicate a rather serious problem, so I think what had happened that he called this a Babinski on the extension of the toe but must have failed to continue the plantar stimulation and realize that the toes all flex normally and this was perfectly normal . . ."

Dr. Smith found no sensory diminution in Amie and he reviewed the x-rays and the CAT scans of the brain and neck. His determination was that she had symptoms of a tension headache, that she had no abnormal neurological findings, no x-ray findings that were abnormal, and no abnormal findings in the CAT scan of her brain. He felt that she had a flexion-extension injury at the time of the accident, causing

a sprained neck. He would not agree that any symptoms existed beyond six weeks that could be attributed to the accident.

His cross-examination is more revealing. Dr. Smith demeaned the testimony of Dr. Keilman, the chiropractor:

"Q. Well, one of the things you said you read was Dr. Keilman's deposition. A. He is not a physician.

"Q. What is he? A. A chiropractor.

"Q. All right, he's a, a--he treats people medically. A. No, he doesn't. He treats by chiropractic means.

". . .

"A. Even if he were a physician, and even if then he were a specialist in a -- this particular field, even specialists in the same field can have marketedly different opinions. I would just say it was a difference of opinion and in this opinion it is a difference of opinion without the -- the expertise that I have."

Dr. Smith further testified that he attached no significance to the loss of lordotic curvature found by Dr. Keilman. He intimated indirectly that Dr. Nelson did not know how to conduct a Babinski test, since Dr. Nelson was a neurologist, and he, Smith, was a neurosurgeon. He discounted any medical authority cited to him, saying:

"Q. Well, here's another. A. Proving my point that you can get any article to support any point you want.

"Q. I want to ask you something about that, doctor. When you go to -- to school you read books, don't you? A. Sure.

"Q. And don't you rely upon them for your practice of medicine. A. Never.

"Q. You don't? A. No.

"Q. And don't your -- the people that teach you and your other experts, don't they write books? A. Sure.

"Q. But you don't rely on them? A. Never. The purpose of a medical education is to learn to sort

out the literature so that you can rely on some things, you can use some things to help you, but your total -- what you rely on is your knowledge of the anatomy, the physiology, a knowledge of pathology, of what happens, and you don't learn that in books. In fact, you don't learn medicine in books or articles.

"Q. And you don't apparently practice medicine from books. A. No I don't.

"Q. There is a vast literature that has grown up in the medical field, don't you pursue any of that? A. Of course I do. I take it all into advisement, but I never rely solely upon any article. To do so would be absolutely foolhearty.

"Q. And you don't recognize any article as being authoritative? A. Well, of course not."

Thus if the world disagreed with Dr. Smith, the world was wrong and he was right.

At the risk of being called a fact-finder myself, I think the jury rejected the testimony of Dr. Smith, but I am positive that the court rejected it. For that reason, the District Court, viewing the remaining testimony of the medical witnesses for Amie Brown and her own testimony, determined that a $12,000 award for her pain, suffering and other damages, past and future, was inadequate as a matter of law. I agree.

Counsel for the defendant must also have agreed when he suggested to the jury that $30,000 was a fair, proportionate award. Counsel for the defendant was not in the business of giving away his client's money.

The only effect of a district court's motion to grant a new trial is to have another jury take a look at the case. A fear seems to be developing in this Court that juries are not to be trusted in the matter of damages. (See for example, Weber v. Blue Cross of Montana (Mont. 1982), 643 P.2d 198, 39 St.Rep. 245.) I trust we are not about to revert to the philosophy of 20 years ago expressed in the O'Brien cases, an

- 12 -

era of decisions that brought about so much discredit to this Court among members of the Bar. O'Brien v. Great Northern Railway (1966), 148 Mont. 429, 421 P.2d 710; (1965) 145 Mont. 13, 400 P.2d 634.

_____
Justice

I concur in the foregoing dissent.

_____
Justice