No. 83-372

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

ROBERT E. EWING,

        Plaintiff and Respondent,

   -vs-

DON L. ESTERHOLT, WILLIAM P. ORDWAY
d/b/a FROMBERG SCRAP, JAMES K. LAFEVER
and UNITED PARCEL SERVICE, a corp.,

        Defendants and Appellants.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and for the County of Flathead,
The Honorable Joseph B. Gary, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        Hash, Jellson, O'Brien & Bartlett; Kenneth E. O'Brien,
Kalispell, Montana

    For Respondent:

        Keller & German; Robert S. Keller, Kalispell, Montana

Submitted on Briefs: December 8, 1983

Decided: June 7, 1984

Filed: JUN 7 1984

*Ethel M. Harrison*
_____
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This case arose out of a traffic accident which took place in 1977 near Somers, Montana. After a jury verdict was entered, the District Court granted a new trial on the motion of respondent Ewing. Defendants LaFever and United Parcel Service, (hereinafter UPS) appeal from this order, from several jury instuctions given and refused, and from a ruling allowing one of plaintiff's expert witnesses to testify.

On October 31, 1977, defendant Esterholt was driving a truck-trailer combination north on U.S. Highway 93 along the west shore of Flathead Lake. Appellant LaFever followed Esterholt driving a UPS van. Just south of Somers, Montana, the two vehicles proceeded up a hill in this order, traveling at approximately ten to fifteen miles per hour until they reached the crest of the hill. As they descended, both vehicles began to pick up speed. A no-passing zone extended downward from the top of the hill for several hundred feet, but when this zone ended LaFever pulled into the left lane and began to pass Esterholt.

During the course of the pass Esterholt continued to increase his speed, causing LaFever to proceed into a no-passing zone to overtake him. This was complicated further by the fact that the highway curved sharply to the right at the bottom of the hill. When LaFever reached the rear of Esterholt's cab, he saw an oncoming vehicle which was flipping its lights alternatively from bright to dim to call attention to itself. LaFever elected to complete the pass rather than slowing down to return to his lane behind

Esterholt. LaFever completed the pass and returned to his lane, missing a head on collision with the oncoming vehicle by approximately twenty feet. There was no contact between the LaFever and Esterholt vehicles.

Shortly after the pass was completed, the Esterholt vehicle overturned into the other lane of traffic, causing the deaths of three people in an oncoming car and injuring respondent Ewing in the following oncoming car. The primary question in the case is why Esterholt's vehicle overturned. Esterholt and respondent Ewing contend that LaFever cut so closely in front of Esterholt that he was forced to turn sharply to avoid hitting him, which caused his load to shift and the truck to overturn. However, LaFever contends that he was safely past Esterholt when the accident occurred. He contends Esterholt was simply traveling too fast to negotiate the curve, and the truck began to slide to the outside of the curve from centrifugal force and eventually tipped over.

The trial was not held until over five years after the accident occurred, at which time the plaintiff introduced into evidence a diagram of the accident scene. The diagram had been drawn by a Montana Department of Highways engineer using the figures obtained by the investigating highway patrolmen. On the diagram the tire skid marks made by Esterholt's vehicle were shown. The skid marks were placed in the early part of the curve, where the road was still relatively straight.

Plaintiff called an expert on accident reconstruction, Dennis Parr, as part of his case in chief. His testimony was based on the diagram, the figures and distances

contained in the patrolmen's notes, and his own investigation of the accident scene. Since he was not consulted until over a year after the accident occurred, he had to rely on second hand information as to the placement of the skid marks. He was able to make his own measurements to determine the radius or sharpness of the curve. Based on the data accumulated, he found that the radius of the curve was 1,950 feet at the point where the skid marks were placed. Based on that figure and his computations, Parr testified that Esterholt would have to have been traveling at 105 to 110 miles per hour for those skid marks to have come from his vehicle sliding sideways from centrifugal force, as LaFever testified.

Parr had also interviewed several eyewitnesses to the accident, who stated that the point where the skid marks were placed was also the point where LaFever cut in front of Esterholt. Since he had already concluded that the skid marks could not have been caused by Esterholt sliding sideways from centrifugal force, he theorized that they must have come from the truck sliding sideways after LaFever cut in front of him.

At the close of Ewing's case, LaFever and UPS presented their evidence and recalled one of the highway patrolmen, questioning the accuracy of the tire mark placement on the diagram. After several discussions, the patrolman concluded that they had been incorrectly placed on the diagram. He so testified, and further stated that they should have been placed further into the curve where the radius was sharper.

Counsel for Ewing immediately asked to be heard in

chambers where he requested a continuance based on alleged surprise, or in the alternative a mistrial. After considerable discussion in chambers, the trial judge denied the motion for continuance and took the motion for mistrial under advisement.

When appellant's accident reconstruction expert testified, he estimated that the radius of the curve where the tire marks now lay was between 1,950 feet and 825 feet. Based on that estimate he further testified that Esterholt could have left the sliding marks traveling at beween 50 and 60 miles per hour. Respondent's expert, Parr, testified that he could not honestly advise the jury on the cause of the accident after the new placement of the skidmarks, given the short period of time he had to analyze the change.

At the conclusion of the trial, the jury found no negligence on the part of LaFever, but did find Esterholt negligent and assessed damages against him. Shortly thereafter respondent moved for a new trial on the grounds that the patrolman's change of testimony amounted to accident and surprise which he could not have guarded against. Briefs were filed and oral arguments heard, after which the motion for a new trial was granted. From this order and other rulings during the course of the trial, this appeal is taken.

The following issues are presented by appellant:

(1) Did the trial court err by granting the motion for a new trial?

(2) Did the trial court err in refusing to give appellant's proposed instructions nos. 11 and 13?

(3) Did the trial court err in refusing to grant

-5-

defendant a continuance or exclude respondent's expert witness?

(4) Did the trial court err in allowing respondent's expert witness to give his opinion concerning respondent's income loss predicated upon work life expectancy as of the trial date rather than the date of the accident?

(5) Did the trial court err in allowing respondent's expert witness to testify concerning loss of corporate profits as evidence of respondent's lost profits?

With respect to the first issue, this Court has stated consistently that "[T]he granting of a new trial is within the sound discretion of the trial court and its order granting a new trial will be reversed only for manifest abuse of that discretion." Haynes v. County of Missoula (1973), 163 Mont. 270 at 278, 517 P.2d 370 at 375. Respondent moved for a new trial based on the grounds enumerated in Section 25-11-102(3), MCA, that the change in testimony amounted to "[A]ccident or surprise which ordinary prudence could not have guarded against..."

The criteria which must be met before a new trial may be granted on the grounds of surprise were first announced by this Court in Hill v. McKay (1908), 36 Mont. 440, 93 P. 345, where we said:

> "* * * it is the general rule that a new trial will be granted on the ground of surprise only when it is clearly shown that the movant was actually surprised, that the facts from which the surprise resulted had a material bearing on the case, that the verdict or decision resulted mainly from these facts, that the alleged condition is not the result of movant's own inattention or negligence, that he has acted promptly and claimed relief at the earliest opportunity, that he has used every means reasonably available at the time of the

-6-

> surprise to remedy the disaster, and that
> the result of a new trial will probably
> be different." 36 Mont. 446, 93 P. at
> 347.

These criteria were confirmed in a more recent case, Morris v. Corcoran Pulpwood Co. (1970), 154 Mont. 468, 465 P.2d 827.

Appellant contends that three of the above criteria are absent from this case. First he contends that respondent could have prevented this surprise and found the mistake by exercising ordinary prudence, arguing that appellant's attorney found the mistake by exercising such ordinary care. However, it was not ordinary prudence, but extraordinary scrutiny which found the mistake. As the trial judge noted in his memorandum in support of his ruling granting the new trial, the mistake was not uncovered when appellant cross examined the partolman on the first day of trial. Moreover, several experts had examined the chart over a period of almost six years and the error had not been found by anyone. Whether the mistake could have been found by exercising ordinary prudence is a question of fact which was resolved in favor of respondent by the trial judge on the facts presented; it was clearly within his discretion to do so.

Appellant next contends that the change in position of the tire tracks did not have a material bearing on the case, and the verdict did not result from this change. The fallacy of this assertion is readily apparent. The ultimate issue of this case was what caused the truck-trailer combination to capsize. The testimony at trial became polarized around two possible explanations for the accident, which were presented by the expert testimony offered by both

sides. Essential to resolution of this problem was the accurate placement of the skid marks, and their mistaken placement was what surprised respondent. It could not reasonably be said that the mistake did not have a material bearing on the case. Whether the mistake brought about the verdict is a question that could not be answered with certainty, as many factors contribute to a jury verdict. As pointed out by respondent, his expert could not give an opinion on the cause of the accident after the placement of the skid marks was changed. This further lessened his credibility which was impugned when the mistake was initally uncovered. As the testimony unfolded, the case became a question of which experts' theory was correct, and any loss of credibility would have a major impact on the outcome. The trial judge was clearly within his discretion in finding that the verdict resulted from the surprise.

Finally, appellant contends that the result of a new trial will not be different. The focus of appellant's attention is on the affidavit submitted with respondent's motion for a new trial, which it claims includes nothing to indicate that a new trial would result in a different verdict. However, it is not from the affidavit alone that this determination is made, but from the facts and circumstances of the case itself.

The standard is whether the result of the new trial will probably be different. In making this determination, the trial court must look not only at the impact of the new facts underlying the surprise, but at the impact of the surprise on the trial as a whole. The different result expected need not be drastically different, and may not be,

especially where as here the jury is dealing with percentages of liability. As noted above, the impact of the surprise on the presentation of respondent's case was great, a fact which was acknowledged by counsel for appellant during discussions held in chambers. The trial judge stated in his memorandum in support of the order granting the new trial that there is a "likelihood" that the result would be different, and we find no cause to differ from this opinion. Without delving into the semantics of this requirement we will defer to the decision of the experienced District Court Judge who tried the case. In his opinion the result of a new trial without the surprise would probably be different. It was clearly within his discretion to draw such a conclusion.

Appellant's next two specifications of error deal with jury instructions. Appellant obtained a favorable verdict in spite of the alleged errors, thus it seems ambiguous to contend there were such errors. However as we are affirming the order granting the new trial and similar instructions will likely be proposed there, we do not deem it premature to rule on the propriety of the instructions.

Appellant first contends that its proposed instruction no. 11 was improperly refused. The proposed instruction read:

> "You are instructed that the driver of a motor vehicle is not obliged to anticipate negligence on the part of other drivers using the roadway. A person who, himself, is exercising ordinary care has the right to assume that others, too, will perform their duty under the law, and he has a further right to rely and act on that assumption. Thus it is not negligence for such a person to fail to anticipate an accident which can happen only from a violation of law or

-9-

duty by another."

Appellant simply argues that the proposed instruction is a proper statement of the law and should have been submitted to the jury. However, this is not the only factor upon which a trial court bases its decisions on jury instructions. "Ordinarily a party has the right to instructions adaptable to his theory of the case." Cremer v. Cremer Rodeo Land and Livestock (Mont. 1981), 627 P.2d 1199 at 1200, 38 St.Rep. 574 at 576, citing Meinecke v. Skaggs (1949), 123 Mont. 308 at 313, 213 P.2d 237 at 240. However as pointed out in Cremer, this rule is not absolute. An instruction which comments on the evidence is properly refused. Suhr v. Sears Roebuck and Company (1969), 152 Mont. 344, 450 P.2d 87. "Any instruction which assumes as fact a matter legitimately in controversy, as shown by the evidence, is erroneous." Demaree v. Safeway Stores, Inc. (1973), 162 Mont. 47 at 54, 508 P.2d 570 at 575.

The District Court ruled that appellant's proposed instruction no. 11 commented on the evidence as it implied that LaFever was not negligent even though his negligence was legitimately in doubt. The theory upon which this instruction was submitted was that Esterholt was 100% negligent and any negligence on LaFever's part was caused by Esterholt. This theory was adequately covered by several instructions given by the District Court. The court's instruction no. 7 was identical to the first sentence of appellant's proposed no. 11. The court's instruction no. 11 stated that it is negligent as a matter of law for a driver of a vehicle being passed to increase its speed before it is completely passed. The court's instruction no. 12 stated

that involuntary violation of a statute in an emergency due to circumstances beyond the driver's control does not constitute negligence. From these instructions the jury could have found and in fact did find Esterholt 100% negligent. We therefore conclude instruction 11 was properly denied.

Appellant next contends the District Court erred by not giving its proposed instruction no. 13, on sudden emergency, which read:

> "A sudden emergency exists when the driver of a motor vehicle is suddenly placed in a position of imminent peril, great mental stress, or danger, which situtation has not been brought about by his own negligence, but in which instant action is necessary to avoid a threatened danger. But the driver must use that care which the ordinary prudent person would exercise under like or similar circumstances. One suddenly confronted with a peril through no fault of his own, who in attempting to escape does not choose the best or safest way should not be held negligent because of such choice, unless it was so hazardous that an ordinary prudent person would not have made it under similar circumstances."

This Court adheres to the rule that a jury instruction on the doctrine of sudden emergency has no place in an ordinary automobile accident case. An extensive discussion of the rationale behind this rule is found in our opinion in Eslinger v. Ringsby Truck Line, Inc. (1981), 195 Mont. 292, 636 P.2d 254, and that rationale applies equally well to the case at bar. In Eslinger, supra, we concluded:

> "The sudden emergency doctrine admonition contained in Kudrna [v. Comet Corporation (1977), 175 Mont. 29, 572 P.2d 183] . . . is well taken and now, in view of this jurisdiction's adoption of the doctrine of comparative negligence, we would at this time admonish the trial courts that the instruction not be given in an ordinary automobile accident case. It is

unnecessary and confusing. The ordinary rules of negligence are applicable and afford a sufficient gauge by which to appraise conduct. 195 Mont. at 302, 636 P.2d at 260.

" . . .

"Before an instruction on the doctrine of sudden emergency is given, the evidence should be sufficient to support a finding that: (1) the claimed emergency actually or apparently existed; (2) the perilous situation was not created or contributed to by the person confronted; (3) alternative courses of action in meeting the emergency were open to such person or there was an opportunity to take some action to avert the threatened casualty; and (4) the action or course taken was such as would or might have been taken by a person of reasonable prudence in the same or similar situation." 195 Mont. at 300-301, 636 P.2d at 259.

The trial judge here did not feel the second element above was present. In fact, as we noted before, LaFever's negligence or lack thereof was still very much in dispute. In this situation the sudden emergency instruction would have amounted to a comment on the evidence as it implied no negligece on LaFever's part. Giving the proposed instruction would have been error, and it was properly refused.

The remaining issues concern the testimony of Dennis O'Donnell, an economist who testified to present and future economic damages on behalf of respondent. Appellant first contends that Mr. O'Donnell should not have been permitted to testify because his name was not disclosed until immediately before trial. We find it unnecessary to discuss this issue in view of the fact we are upholding the trial court's granting of a new trial. Appellant will have time to prepare for the testimony of O'Donnell before the new trial.

-12-

Appellant next objects to the content of Mr. O'Donnell's testimony. First he contends it was error for Mr. O'Donnell to measure respondent's work life expectancy from the date of trial instead of the date of the accident. Second he contends it was error for Mr. O'Donnell to base his estimate of respondent's lost earnings on profits of the corporation in which respondent was the majority shareholder.

In Montana, damages may be awarded for detriment which has accrued up to the time of trial and detriment which is "certain to result in the future." Section 27-1-203, MCA. This Court has long held that the loss of future earning capacity is such a future detriment which may be compensated for by money damages. Salvail v. Great Northern Railway (1970), 156 Mont. 12, 473 P.2d 549. However, the nature of such damages makes their amount difficult to ascertain, as they are designed to compensate for what would have probably occurred in the future. Absent a crystal ball, the course of future events remains a mystery.

To reduce the inherent uncertainty of future damages, this Court has allowed testimony from various economic experts and the use of mortality and actuarial tables to aid jury determinations. See, Krohmer v. Dahl (1965), 145 Mont. 491, 402 P.2d 979; and Cornell v. Great Northern Railway (1920), 57 Mont. 177, 187 P. 902. This is consistent with the rule that competent evidence must be introduced to prove damages, the award must not be based on mere conjecture and speculation. Bush v. Chilcott (1922), 64 Mont. 346, 210 P. 907. However, there is nothing magical about this type of evidence, and it does not preclude the elicitation of other

relevant evidence which may show the scientific opinion either liberal or conservative.

The underlying damage question posed to the jury here was basically, "How long would respondent have worked if he had not been injured?" Respondent presented scientific evidence of his work life expectancy computed prospectively from the date of the accident. In addition, he presented testimony that given the nature of his job and personality, he would have outdistanced this measurement. Testimony was also presented showing his work life expectancy computed prospectively from the date of the trial, which added over two years to the estimate of his work life expectancy computed from the date of the accident. Appellant objected to this testimony contending that the work life expectancy must be measured from the date of the accident. We agree with this contention in that it is true respondent's damages for loss of earning capacity began accruing on the date of the accident. The question, however, is how long from that point in time would he have continued working. We must point out that under the facts of this case appellant mistakenly relies on the unfailing accuracy of the work life charts. This testimony must be weighed against all other evidence bearing on how long respondent would have worked.

It must be remembered that damages are allowed not only up to the time of trial, but also into the future. Section 27-1-203, MCA. Here there was competent testimony that, because of respondent's particular circumstances, he would have continued working not only up to but past the date of trial had he not been injured. Therefore his actual work life expectancy could more accurately be measured from

the trial date. The weight to be accorded this estimate is left to the discretion of the jury. The judge properly allowed the testimony.

Lastly we come to Mr. O'Donnell's testimony on the amount of lost earnings. Again we note that this evidence on damages is open to attack on cross examination. Its accuracy is up to the jury to decide. Given the nature of respondent's business and the fact that it was a Subchapter S corporation, the trial judge felt the testimony on corporate profits would aid the jury in determining respondent's lost earnings. The trial judge is vested with a large amount of discretion in determining what testimony is to be allowed by expert witnesses. Krohmer, supra. We find no abuse of discretion here.

The judgment of the District Court granting respondent's motion for a new trial is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-15-